BARRINGTON D. PARKER, Circuit Judge:
This consolidated appeal is from the judgments of the United States District Court for the Southern District of New York (Pauley, /.) dismissing two complaints for lack of subject matter jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350 (“ATS”), and in the alternative, on the ground of forum non conveniens. Plaintiffs-Appellants Rabi Abdullah! and other Nigerian children and their guardians sued Defendant-Appellee Pfizer, Inc. under the ATS (“the Abdullahi action”). They alleged that Pfizer violated a customary international law norm prohibiting involuntary medical experimentation on humans when it tested an experimental antibiotic on children in Nigeria, including themselves, without their consent or knowledge. Plaintiffs-Appellants Ajudu Ismaila Adamu and others, also children and their guardians who were part of Pfizer’s Nigerian drug experiment, brought a similar action against Pfizer, alleging violations of the ATS, the Connecticut Unfair Trade Practices Act (“CUTPA”), and the Connecticut Products Liability Act (“CPLA”) (“the Adamu action”). Pfizer moved to dismiss both actions for lack of subject matter jurisdiction *169 and on the basis of forum non coveniens. The district court granted the motions and both sets of plaintiffs have appealed.
As explained below, we conclude: (1) that the district court incorrectly determined that the prohibition in customary international law against nonconsensual human medical experimentation cannot be enforced through the ATS; (2) that changed circumstances in Nigeria since the filing of this appeal require re-examination of the appropriate forum, albeit on the basis of a legal analysis different from that employed by the district court; and (3) that the district court incorrectly applied Connecticut’s choice of law rules in the Adamu action. Consequently, we reverse and remand the cases to the district court for further proceedings.
BACKGROUND

A. Pfizer’s Trovan Test in Nigeria

On review of a district court’s grant of a motion to dismiss, we assume as true the facts alleged in the complaints, construing them in the light most favorable to the appellants. See Vietnam Ass’n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir.2008). The central events at issue in these cases took place in 1996, during an epidemic of bacterial meningitis in northern Nigeria.[1] The appellants allege that at that time, Pfizer, the world’s largest pharmaceutical corporation, sought to gain the approval of the U.S. Food and Drug Administration (“FDA”) for the use on children of its new antibiotic, Trovafloxacin Mesylate, marketed as “Trovan.” They contend that in April 1996, Pfizer, dispatched three of its American physicians to work with four Nigerian doctors to experiment with Trovan on children who were patients in Nigeria’s Infectious Disease Hospital (“IDH”) in Kano, Nigeria. Working in concert with Nigerian government officials, the team allegedly recruited two hundred sick children who sought treatment at the IDH and gave half of the children Trovan and the other half Ceftriaxone, an FDA-approved antibiotic the safety and efficacy of which was well-established. Appellants contend that Pfizer knew that Trovan had never previously been tested on children in the form being used and that animal tests showed that Trovan had life-threatening side effects, including joint disease, abnormal cartilage growth, liver damage, and a degenerative bone condition. Pfizer purportedly gave the children who were in the Ceftriaxone control group a deliberately low dose in order to misrepresent the effectiveness of Trovan in relation to Ceftriaxone. After approximately two weeks, Pfizer allegedly concluded the experiment and left without administering follow-up care. According to the appellants, the tests caused the deaths of eleven children, five of whom had taken Trovan and six of whom had taken the lowered dose of Ceftriaxone, and left many others blind, deaf, paralyzed, or brain-damaged.
Appellants claim that Pfizer, working in partnership with the Nigerian government, failed to secure the informed consent of either the children or their guardians and specifically failed to disclose or explain the experimental nature of the study or the serious risks involved. Although the treatment protocol required the researchers to offer or read the subjects documents requesting and facilitating their informed consent, this was allegedly not done in *170 either English or the subjects’ native language of Hausa. The appellants also contend that Pfizer deviated from its treatment protocol by not alerting the children or their guardians to the side effects of Trovan or other risks of the experiment, not providing them with the option of choosing alternative treatment, and not informing them that the non-governmental organization Médecins Sans Frontiéres (Doctors Without Borders) was providing a conventional and effective treatment for bacterial meningitis, free of charge, at the same site.[2]
The appellants allege that, in an effort to rapidly secure FDA approval, Pfizer hastily assembled its test protocol at its research headquarters in Groton, Connecticut, and requested and received permission to proceed from the Nigerian government in March 1996. At the time, Pfizer also claimed to have secured approval from an IDH ethics committee. Appellants allege, however, that the March 1996 approval letter was backdated by Nigerian officials working at the government hospital well after the experiments had taken place and that at the time the letter was purportedly written, the IDH had no ethics committee.[3] Appellants also contend that the experiments were condemned by doctors, including one on Pfizer’s staff at the time of the Kano trial.
In 1998, the FDA approved Trovan for use on adult patients only. After reports of liver failure in patients who took Trovan, its use in America was eventually restricted to adult emergency care. In 1999, the European Union banned its use.

B. The Proceedings Below

In August 2001, the Abdullahi plaintiffs sued Pfizer under the ATS, alleging that the experiments violated international law. In September 2002, the district court granted Pfizer’s motion to dismiss the Abdullahi claims on the ground oí forum non conveniens, conditioned on Pfizer’s consent to litigation in Nigeria. Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118(WHP), 2002 WL 31082956, at *12 (S.D.N.Y. Sept. 17, 2002) (“Abdullahi I ”). It found that Nigeria was an adequate alternative forum despite plaintiffs’ contentions about corruption in the Nigerian court system. Id. at *8-10. The district court denied Pfizer’s motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., concluding that the plaintiffs adequately alleged that Pfizer’s collusion with the Nigerian government made it a state actor. Id. at *5-6.
Meanwhile, another group of children and guardians involved in the Trovan experiment sued in the Federal High Court in Kano, alleging claims under Nigerian law. That case, Zango v. Pfizer International, Inc., [2001] Suit No. FHC/ *171 K/CS/204/2001 (Nigeria), was dismissed in 2003 after plaintiffs voluntarily discontinued the suit following the removal from the bench of the first judge assigned to the action and the second judge’s decision to decline jurisdiction for personal reasons. Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118(WHP), 2005 WL 1870811, at *5 (S.D.N.Y. Aug. 9, 2005) (“Abdullahi III”). On appeal to this Court from the district court’s dismissal in Abdullahi I, the Abdullahi appellants argued that the dismissal of the Zango litigation was a result of rampant corruption, which indicated that the Nigerian judicial system could not provide an adequate alternative forum for their action. Given an inconclusive record regarding the events leading to the dismissal of the Zango lawsuit, we vacated the judgment and remanded for further fact-finding on forum,' non conveniens. See Abdullahi v. Pfizer, Inc., 77 Fed.Appx. 48, 53 (2d Cir.2003) (summary order) (“Abdullahi II ”).
In November 2002, following the dismissal of the Zango lawsuit, a number of the Zango plaintiffs filed the Adamu action. They alleged that in planning the Trovan experiment in Connecticut and in conducting the tests in Nigeria without informed,consent, Pfizer violated the CUT-PA, the CPLA, and the ATS. Eventually, the Adamu action was transferred to the Southern District of New York and consolidated with the Abdullahi action. Pfizer then moved to dismiss both cases for failure to state a claim under the ATS and on the basis of forum non conveniens. It also moved to dismiss in Adamu on the ground that Connecticut choice of law principles require the application of Nigerian law, which bars suit under CUTPA and the CPLA.
The district court granted the motions. See Abdullahi III, 2005 WL 1870811; Adamu v. Pfizer, Inc., 399 F.Supp.2d 495 (S.D.N.Y.2005). In Abdullahi III, Judge Pauley held that while “[pjlaintiffs correctly state that non-consensual medical experimentation violates the law of nations and, therefore, the laws of the United States,” they failed to identify a source of international law that “provide[s] a proper predicate for jurisdiction under the ATS.” 2005 WL 1870811, at *9, 14. Noting that “a decision to create a private right of action is one better left to legislative judgment in the great majority of cases,” he concluded that “[a] cause of action for Pfizer’s failure to get any consent, informed or otherwise, before performing medical experiments on the subject children would expand customary international law far beyond that contemplated by the ATS.” Id. at *13-14 (internal quotation marks omitted).
With regard to the forum non conveniens analysis, the district court declined to accept plaintiffs’ submissions concerning Pfizer’s alleged bribery of Nigerian officials on the ground that they were not based on personal knowledge. Id. at *16-17. Finding that the plaintiffs had failed to submit specific evidence that the Nigerian judiciary would be biased against its own citizens in an action against Pfizer, the district court alternatively held that Nigeria was an adequate alternate forum. Id. at *16,18.
Several months later, the district court also granted Pfizer’s motion to dismiss the Adamu case. Adamu, 399 F.Supp.2d 495. It relied on its Abdullahi III decision to hold that the plaintiffs could not establish jurisdiction under the ATS. Id. at 501. The district court also incorporated the forum non conveniens analysis from Abdullahi III to find that Nigeria is an adequate forum. Id. at 504. Applying the public and private interest factors set forth in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), superseded by statute on other grounds as *172 recognized in Cowan v. Ford Motor Co., 713 F.2d 100, 103 (5th Cir.1983), the court found that while public interest factors did not support either forum, private interest factors weighed in favor of dismissal. Adamu, 399 F.Supp.2d. at 505-06. The district court also dismissed the Adamu plaintiffs’ Connecticut law claims, concluding that, under Connecticut choice of law principles, the action was governed and barred by Nigerian law. Id. at 503.
The Abdullahi and Adamu plaintiffs appealed. Since then, a tectonic change has altered the relevant political landscape. In May 2007, the state of Kano brought criminal charges and civil claims against Pfizer, seeking over $2 billion in damages and restitution.[4] Around the same time, the federal government of Nigeria sued Pfizer and several of its employees, seeking $7 billion in damages.[5] None of these cases seek compensation for the subjects of the tests, who are the appellants before this Court. Pfizer then notified this Court that in light of these recent developments, which it believed required further consideration by the district court, it would not seek affirmance on the basis of forum non conveniens.
DISCUSSION
The district court dismissed both actions based on its determination that it lacked subject matter jurisdiction because plaintiffs failed to state claims under the ATS. We review dismissal on this ground de novo. Rweyemamu v. Cote, 520 F.3d 198, 201 (2d Cir.2008). “To survive dismissal, the plaintiff[s] must provide the grounds upon which [their] claim rests through factual allegations sufficient ‘to raise a right to relief above the speculative level.’ ” ATSI Commc’ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 5. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)).[6]

I. The Alien Tort Statute

The Alien Tort Statute, 28 U.S.C. § 1350, provides that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” Included in the Judiciary Act of 1789, the statute provided jurisdiction in just two cases during the first 191 years after its enactment. See Taveras v. Taveraz, 477 F.3d 767, 771 (6th Cir.2007). In the last thirty years, however, the ATS has functioned slightly more robustly, conferring jurisdiction over a limited category of claims.
We first extensively examined the ATS in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), where we held that conduct violating the law of nations is actionable under the ATS “only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords.” Id. at 888. Following *173 Filartiga, we concluded that ATS claims may sometimes be brought against private actors, and not only state officials, see Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir.1995), when the tortious activities violate norms of “universal concern” that are recognized to extend to the conduct of private parties — for example, slavery, genocide, and war crimes, id. at 240. This case involves allegations of both state and individual action. In Flores v. Southern Peru Copper Corp., 414 F.3d 233 (2d Cir.2003), we clarified that “the law of nations” in the ATS context “refers to the body of law known as customary international law,” which “is discerned from myriad decisions made in numerous and varied international and domestic arenas” and “does not stem from any single, definitive, readily-identifiable source.” Id. at 247-48. These principles are rejected in their entirety by our dissenting colleague. In Flores, we concluded that ATS jurisdiction is limited to alleged violations of “those clear and unambiguous rules by which States universally abide, or to which they accede, out of a sense of legal obligation and mutual concern.” Id. at 252. Applying this standard, we held that the appellants’ claim that pollution from mining operations caused lung disease failed to state a violation of customary international law. We reasoned that the “right to life” and the “right to health” were insufficiently definite to constitute binding customary legal norms and that there was insufficient evidence to establish the existence of a narrower norm prohibiting intranational pollution. Id. at 254-55.
In 2004, the Supreme Court comprehensively addressed the ATS for the first time in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Justice Souter, writing for the majority, clarified that the ATS was enacted to create jurisdiction over “a relatively modest set of actions alleging violations of the law of nations” and with “the understanding that the common law would provide a cause of action.” Id. at 720, 723. The Supreme Court confirmed that federal courts retain a limited power to “adapt[] the law of nations to private rights” by recognizing “a narrow class of international norms” to be judicially enforceable through our residual common law discretion to create causes of action. Id. at 728-29. It cautioned, however, that courts must exercise this power with restraint and “the understanding that the door [to actionable violations] is still ajar subject to vigilant doorkeeping,” permitting only those claims that “rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized.” Id. at 725, 729. These 18th-centu-ry paradigms consist of offenses against ambassadors, violations of the right to safe passage, and individual actions arising out of piracy. Id. at 724. The common theme among these offenses is that they contravened the law of nations, admitted of a judicial remedy, and simultaneously threatened serious consequences in international affairs. Id. at 715. Lower courts are required to gauge claims brought under the ATS against the current state of international law, but are permitted to recognize under federal common law only those private claims for violations of customary international law norms that reflect the same degree of “definite content and acceptance among civilized nations” as those reflected in the 18th-century paradigms. Id. at 732-33. The Supreme Court in Sosa also counseled that “the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that *174 cause available to litigants” in federal courts. Id.
In this way Sosa set a “high bar to new private causes of action” alleging violations of customary international law. Id. at 727. A federal court can recognize one only if a plaintiff identifies the violation of a norm of customary international law that, as defined by the sources of such law that United States courts “have long, albeit cautiously, recognized,” id. at 733-34 (referencing The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)), is sufficiently specific, universal, and obligatory to meet the standards established by Sosa. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739 (citing with approval Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 781 (D.C.Cir.1984) (Edwards, J., concurring), and In re Estate of Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994)). Applying these principles, the Supreme Court held that the plaintiff, a Mexican national who sued a fellow Mexican national under the ATS for allegedly aiding in his illegal abduction by agents of the U.S. Drug Enforcement Agency, had failed to allege the violation of a customary international law norm with the required precision. Sosa, 542 U.S. at 738, 124 S.Ct. 2739. The Supreme Court found that the practical consequences of recognizing a general and broad customary international law prohibition of arbitrary detention in a case involving “a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment” would be “breathtaking” and inappropriate. Id. at 736, 738, 124 S.Ct. 2739.
Since Sosa, this Court has reviewed three judgments dismissing claims under the ATS. In Khulumani v. Barclay National Bank, Ltd., 504 F.3d 254 (2d Cir.2007) (per curiam), we held that the ATS conferred jurisdiction over multinational corporations that purportedly collaborated with the government of South Africa in maintaining apartheid because they aided and abetted violations of customary international law. Id. at 260. In Vietnam Ass’n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104 (2d Cir.2008), we concluded that the ATS did not support a claim that the defendants violated international law by manufacturing and supplying Agent Orange and other herbicides used by the United States military during the Vietnam War. Id. at 123. We reasoned that the sources of law on which the appellants relied did not define a norm prohibiting the wartime use of Agent Orange that was both universal and sufficiently specific to satisfy the requirements of Sosa. Id. at 119-23. Similarly, in Mora v. People of the State of New York, 524 F.3d 183 (2d Cir.2008), we held that the norm at issue — one that prohibits the detention of a foreign national without informing him of the requirement of consular notification and access under Article 36(1)(b)(3) of the Vienna Convention on Consular Relations — was insufficiently universal to support a claim under the ATS. Id. at 208-09.
Turning now to this appeal, and remaining mindful of our obligation to proceed cautiously and self-consciously in this area, we determine whether the norm alleged (1) is a norm of international character that States universally abide by, or accede to, out of a sense of legal obligation; (2) is defined with a specificity comparable to the 18th-century paradigms discussed in Sosa; and (3) is of mutual concern to States.

A The Prohibition of Nonconsensual Medical Experimentation on Humans

Appellants’ ATS claims are premised on the existence of a norm of custom *175 ary international law prohibiting medical experimentation on non-consenting human subjects. To determine whether this prohibition constitutes a universally accepted norm of customary international law, we examine the current state of international law by consulting the sources identified by Article 38 of the Statute of the International Court of Justice (“ICJ Statute”), to which the United States and all members of the United Nations are parties. Flores, 414 F.3d at 250; see, e.g., United States v. Yousef, 327 F.3d 56, 100-01 (2d Cir.2003). Article 38 identifies the authorities that provide “competent proof of the content of customary international law.” Flores, 414 F.3d at 251. These sources consist of:
(a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
(b) international custom, as evidence of a general practice accepted as law;
(c) the general principles of law recognized by civilized nations;
(d) ... judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.
Statute of the International Court of Justice, art. 38(1), June 26,1945, 59 Stat. 1055, 1060, T.S. No. 993 [hereinafter ICJ Statute].
The appellants ground their claims in four sources of international law that categorically forbid medical experimentation on non-consenting human subjects: (1) the Nuremberg Code, which states as its first principle that “[t]he voluntary consent of the human subject is absolutely essential”; (2) the World Medical Association’s Declaration of Helsinki, which sets forth ethical principles to guide physicians world-wide and provides that human subjects should be volunteers and grant their informed consent to participate in research; (3) the guidelines authored by the Council for International Organizations of Medical Services (“CIOMS”), which require “the voluntary informed consent of [a] prospective subject”; and (4) Article 7 of the International Covenant on Civil and Political Rights (“ICCPR”), which provides that “no one shall be subjected without his free consent to medical or scientific experimentation.” [7]
The district court found that “non-consensual medical experimentation violates the law of nations and, therefore, the laws of the United States” and cited the Nuremberg Code for support. Abdullahi III, 2005 WL 1870811, at *9. It then noted that “[w]hile federal courts have the authority to imply the existence of a private right of action for violations of jus cogens norms of international law, federal courts must consider whether there exist special factors counseling hesitation in the absence of affirmative action by Congress.” Id. (internal citations and quotation marks omitted). The district court then separately analyzed the four sources of international law that prohibit nonconsensual medical experimen *176 tation on humans and the Universal Declaration of Human Rights. Id. at *11-13. It found that with the exception of the Nuremberg Code, these sources contain only aspirational or vague language lacking the specificity required for jurisdiction. Id. at *12-13. It also determined that because the United States did not ratify or adopt any of these authorities except the ICCPR, and because even the ICCPR is not self-executing, none of them create binding international legal obligations that are enforceable in federal court. Id. at *11-13. Finally, the district court concluded that the plaintiffs failed to provide a proper predicate for ATS jurisdiction because none of the sources independently authorizes a private cause of action and the inference of such a cause of action is a matter best left to Congress. Id. at *13-14.[8]
The district court’s approach misconstrued both the nature of customary international law and the scope of the inquiry required by Sosa. It mistakenly assumed that the question of whether a particular customary international law norm is sufficiently specific, universal, and obligatory to permit the recognition of a cause of action under the ATS is resolved essentially by looking at two things: whether each source of law referencing the norm is binding and whether each source expressly authorizes a cause of action to enforce the norm. But Sosa, as we have seen, requires a more fulsome and nuanced inquiry. Courts are obligated to examine how the specificity of the norm compares with 18th-century paradigms, whether the norm is accepted in the world community, and whether States universally abide by the norm out of a sense of mutual concern. By eschewing this inquiry, the district court did not engage the fact that norms of customary international law are “discerned from myriad decisions made in numerous and varied international and domestic arenas” and “[do] not stem from any single, definitive, readily-identifiable source.” Flores, 414 F.3d at 247-48.
The district court also inappropriately narrowed its inquiry in two respects. First, it focused its consideration on whether the norm identified by the plaintiffs is set forth in conventions to which the United States is a party, and if so, whether these treaties are self-executing or executed by federal legislation. While adoption of a self-executing treaty or the execution of a treaty that is not self-executing may provide the best evidence of a particular country’s custom or practice of recognizing a norm, see Flores, 414 F.3d at 257, the existence of a norm of customary international law is one determined, in part, by reference to the custom or practices of many States, and the broad acceptance of that norm by the international community. Agreements that are not self-executing or that have not been executed by federal legislation, including the ICCPR, are appropriately considered evidence of the current state of customary international law. See Khulumani, 504 F.3d at 284 (Katzmann, J., concurring) (noting that “[w]hether a treaty that embodies [a norm of customary international law] is self-executing is relevant to, but is not determinative of, [the] question” of whether the norm permits ATS jurisdiction). A formal treaty, moreover, is not the lone primary source of customary international law. The ICJ Statute permits, and Sosa encourages, among other things, that courts consider “international custom, as evidence of a general practice accepted *177 as law.” ICJ Statute, supra, at art. 38(1); Sosa, 542 U.S. at 734, 124 S.Ct. 2739 (“[WJhere there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations.”) (quoting The Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290).
Second, the district court’s consideration of whether each source of law creates binding legal norms failed to credit the fact that even declarations of international norms that are not in and of themselves binding may, with time and in conjunction with state practice, provide evidence that a norm has developed the specificity, universality, and obligatory nature required for ATS jurisdiction. See Filartiga, 630 F.2d at 883 (“[A non-binding] Declaration creates an expectation of adherence, and insofar as the expectation is gradually justified by State practice, a declaration may by custom become recognized as laying down rules binding upon the States.”) (internal quotation marks omitted). The district court should have considered a greater range of evidence and weighed differently the probative value of the sources on which the appellants relied.
In sum, it was inappropriate for the district court to forego a more extensive examination of whether treaties, international agreements, or State practice have ripened the prohibition of nonconsensual medical experimentation on human subjects into a customary international law norm that is sufficiently (i) universal and obligatory, (ii) specific and definable, and (iii) of mutual concern, to permit courts to infer a cause of action under the ATS. See Sosa, 542 U.S. at 732-35, 124 S.Ct. 2739. We now proceed with such an examination.

i. Universality

The appellants must allege the violation of a norm of customary international law to which States universally subscribe. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739; Vietnam Ass’n for Victims of Agent Orange, 517 F.3d at 117. The prohibition on nonconsensual medical experimentation on human beings meets this standard because, among other reasons, it is specific, focused and accepted by nations around the world without significant exception.
The evolution of the prohibition into a norm of customary international law began with the war crimes trials at Nuremberg. The United States, the Soviet Union, the United Kingdom and France “acting in the interest of all the United Nations,” established the International Military Tribunal (“IMT”) through entry into the London Agreement of August 8, 1945. M. Cheriff Bassiouni et al., An Appraisal of Human Experimentation in International Law and Practice: The Need for International Regulation of Human Experimentation, 72 J.Crim. L. & Criminology 1597, 1640 & n. 220 (1981) (internal quotation marks omitted). Annexed to the London Agreement was the London Charter, which served as the IMT’s Constitution. See Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis Powers, with annexed Charter of the International Military Tribunal art. 2, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279. According to the Charter, the IMT had the “power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organizations, committed,” among other offenses, war crimes and crimes against humanity. Id. at art. 6.
The IMT tried 22 “major” Nazi war criminals leaving “lower-level” war criminals, including “[l]eading physicians ... and leading German industrialists,” to be tried in subsequent trials by U.S. military tribunals acting “under the aegis of the *178 IMT.” United States Holocaust Memorial Museum, War Crimes Trials, Holocaust Encylopedia (2008), http://www.ushmm. org/wlc/article.php?lang=en&ModuleId= 10005140. The law that authorized the creation of the U.S. military tribunals, Control Council Law No. 10, was enacted in 1945 by the Allied Control Council, see id., an authority through which the London Agreement signatories exerted joint-control over Germany, see Encyclopedia Britannica, Germany, Encyclopedia Britannica Online (2009), http://search.eb.com/ eb/article-58214. Control Council Law No. 10 stated that its purpose was to “give effect to the terms of ... the London Agreement ... and the [London] Charter,” and “to establish a uniform legal basis in Germany for the prosecution of war criminals.” Allied Control Council No. 10, preamble, (Dec. 20, 1945), http://avalon. Iaw.yale.edu/imt/imtl0.asp. Law No. 10 expressly incorporated the London Agreement, identifying it as an “integral part[ ] of this Law.” Id. at art. I. Law No. 10 also authorized military tribunals of the occupying powers to prosecute individuals for the same crimes over which the IMT had jurisdiction, including war crimes and crimes against humanity, see id. at arts. II — III, and made military tribunal prosecutions subject to the IMT’s right of first refusal, see id. at art. III. Consequently, the U.S. military tribunals effectively operated as extensions of the IMT, see Telford Taylor, Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 107, 107 (1949) [hereinafter Report on Nuernberg War Crimes Trials], available at http://www.loc.gov/rr/frd/Military_Law/ pdf/NT_final-report.pdf (explaining that “the trials under Law No. 10 were to be a means of carrying out such 'declarations of criminality’ ... as the International Military Tribunal might make” and that “[t]he first [IMT] trial and the 12 following [military tribunal] trials ... form a single sequence based on common principles”), and Control Council Law No. 10 served to implement the commitments undertaken in the London Agreement, see id. at 7 (noting that “the two documents supplemented each other” and “[m]ajor criminals not tried under the one could be tried under the other”).
In August 1947, Military Tribunal 1, staffed by American judges and prosecutors and conducted under American procedural rules, see George J. Annas, The Nuremberg Code in U.S. Courts: Ethics versus Expediency, in The Nazi Doctors and the Nuremberg Code 201, 201 (George J. Annas & Michael A. Grodin eds., 1992), promulgated the Nuremberg Code as part of the tribunal’s final judgment against fifteen doctors who were found guilty of war crimes and crimes against humanity for conducting medical experiments without the subjects’ consent, Brandt, 2 Nuremberg Trials, at 181-82. Among the nonconsensual experiments that the tribunal cited as a basis for their convictions were the testing of drugs for immunization against malaria, epidemic jaundice, typhus, smallpox and cholera. Id. at 175-178. Seven of the convicted doctors were sentenced to death and the remaining eight were sentenced to varying terms of imprisonment. Id. at 298-300. The tribunal emphasized that
[i]n every single instance appearing in the record, subjects were used who did not consent to the experiments; indeed, as to some of the experiments, it is not even contended by the defendants that the subjects occupied the status of volunteers.
Id. at 183. The judgment concluded that “[manifestly human experiments under such conditions are contrary to the principles of the law of nations as they result from usages established among civilized *179 peoples, from the laws of humanity, and from the dictates of public conscience.” Id. (emphasis added and internal quotation marks omitted). The Code created as part of the tribunal’s judgment therefore emphasized as its first principle that “[t]he voluntary consent of the human subject is absolutely essential.” Id. at 181.
The American tribunal’s conclusion that action that contravened the Code’s first principle constituted a crime against humanity is a lucid indication of the international legal significance of the prohibition on nonconsensual medical experimentation. As Justices of the Supreme Court have recognized, “[t]he medical trials at Nuremberg in 1947 deeply impressed upon the world that experimentation with unknowing human subjects is morally and legally unacceptable.” United States v. Stanley, 483 U.S. 669, 687, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (Brennan, J., concurring in part and dissenting in part) (emphasis added); see also id. at 709-10, 107 S.Ct. 3054 (O’Connor, J., concurring in part and dissenting in part).
Moreover, both the legal principles articulated in the trials’ authorizing documents and their application in judgments at Nuremberg occupy a position of special importance in the development of bedrock norms of international law. United States courts examining the Nuremberg judgments have recognized that “[tjhe universal and fundamental rights of human beings identified by Nuremberg — rights against genocide, enslavement, and other inhumane acts ... — are the direct ancestors of the universal and fundamental norms recognized as jus cogens,” from which no derogation is permitted, irrespective of the consent or practice of a given State. Siderman de Blake v. Republic of Arg., 965 F.2d 699, 715 (9th Cir.1992) (cited in Sampson v. F.R.G., 250 F.3d 1145, 1150 (7th Cir.2001)). As Telford Taylor, who first served as an assistant to Justice Robert Jackson during his time as Chief Prosecutor for the IMT and then became Chief of Counsel for War Crimes on the Nuremberg trials held under the authority of Control Council Law No. 10, explained, “Nuernberg was based on enduring [legal] principles and not on temporary political expedients, and this fundamental point is apparent from the reaffirmation of the Nuernberg principles in Control Council Law No. 10, and their application and refinement in the 12 judgments rendered under that law during the 3-year period, 1947 to 1949.” Taylor, Report on Nuernberg War Crimes Trials, at 107 (emphasis added).
Consistent with this view, the Code’s first principle has endured: “[Significant world opinion has not come to the defense of the nature or manner in which the experiments were conducted in the Nazi concentration camps.” Bassiouni et al., supra, at 1641. Rather, since Nuremberg, states throughout the world have shown through international accords and domestic law-making that they consider the prohibition on nonconsensual medical experimentation identified at Nuremberg as a norm of customary international law.[9]
*180 In 1955, the draft International Covenants on Human Rights was revised to add a second sentence to its prohibition of torture and cruel, inhuman or degrading treatment or punishment. The addition provided that “[i]n particular, no one shall be subjected without his free consent to medical or scientific experimentation involving risk, where such is not required by his state of physical or mental health.” Annotations on the text of the draft International Covenants on Human Rights, at 31, U.N. GAOR, 10th Sess., Annexes, agenda item 28(11), U.N. Doc. A/2929 (July 1, 1955). The clause was later revised to offer the simpler and sweeping prohibition that “no one shall be subjected without his free consent to medical or scientific experimentation.” ICCPR, supra, at art. 7. This prohibition became part of Article 7 of the ICCPR, which entered into force in 1976, and is legally binding on the more than 160 States-Parties that have ratified the convention without reservation to the provision.[10] By its terms this prohibition is not limited to state actors; rather, it guarantees individuals the right to be free from nonconsensual medical experimentation by any entity—state actors, private actors, or state and private actors behaving in concert.
Its status as a norm that states conceive as legally binding — and therefore part of customary international law — is confirmed by Article 2 of the accord, which requires that “[e]ach State Party ... undertake[ ] to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant.” ICCPR art. 2(1). The international community’s recognition in the ICCPR of its obligation to protect humans against nonconsensual medical experimentation, regardless of the source of the action, is powerful evidence of the prohibition’s place in customary international law.
It is clear that, as the court mentioned in Sosa, the Universal Declaration of Human Rights and the ICCPR themselves could not establish the relevant, applicable rule of international law in that case. Sosa, 542 U.S. at 754, 124 S.Ct. 2739. Nonetheless, the ICCPR, when viewed as a reaffirmation of the norm as articulated in the Nuremberg Code, is potent authority for the universal acceptance of the prohibition on nonconsensual medical experimentation. As we discuss below, see infra pp. 181-83, the fact that the prohibition on medical experimentation on humans without consent has been consciously embedded by Congress in our law and reaffirmed *181 on numerous occasions by the FDA demonstrates that the United States government views the norm as the source of a binding legal obligation even though the United States has not ratified the ICCPR in full.[11]
In 1964, the World Medical Association adopted the Declaration of Helsinki, which enunciated standards for obtaining informed consent from human subjects. It provided that in clinical research combined with professional care, “[i]f at all possible, consistent with patient psychology, the doctor should obtain the patient’s freely given consent after the patient has been given a full explanation,” and that non-therapeutic clinical research on a person “cannot be undertaken without his free consent, after he has been fully informed.” World Med. Ass’n, Declaration of Helsinki: Code of Ethics of the World Medical Association, art. III(3a), G.A. Res. (1964), http://www.pubmedcentral.nih.gov/ picrender.fcgi?artid= 1816102 & blob-type =pdf. The Declaration has since been amended five times. The informed consent provision now provides that “subjects must be volunteers and informed participants in the research project.” Declaration of Helsinki, supra, at art. 20. The Declaration also requires that “[i]n any research on human beings, each potential subject must be adequately informed of the aims, methods, ... anticipated benefits and potential risks of the study, and the discomfort it may entail” and that researchers “obtain the subject’s freely-given informed consent, preferably in writing.” Id. at art. 22.
Although the Declaration itself is nonbinding, since the 1960s, it has spurred States to regulate human experimentation, often by incorporating its informed consent requirement into domestic laws or regulations. See Delon Human & Sev S. Fluss, The World Medical Association’s Declaration of Helsinki: Historical and Contemporary Perspectives, 8-11 (July 24, 2001) (fifth draft), http://www.wma.neUe/ ethicsuniUpdf/draft_historical_ contemporary_perspectives.pdf (describing legal and regulatory developments in Australia, Belgium, Brazil, China, Israel, Japan, New Zealand, Norway, Switzerland, and the United States following the Declaration of Helsinki). Currently, the laws and regulations of at least eighty-four countries, including the United States, require the informed consent of human subjects in medical research.[12] That this conduct has been the subject of domestic legislation is not, of course, in and of itself proof of a norm. See Flores, 414 F.3d at 249. However, the incorporation of this norm into the laws of this country and this host of others is a powerful indication of the international acceptance of this norm as a binding legal obligation, where, as here, states have shown that the norm is of mutual concern by including it in a variety of international accords.
*182 The history of the norm in United States law demonstrates that it has been firmly embedded for more than 45 years and-— except for our dissenting colleague — its validity has never been seriously questioned by any court. Congress mandated patient-subject consent in drug research in 1962. Bassiouni et al., supra, at 1624 (citing 21 U.S.C. § 355(i) (1976)). In response, the FDA promulgated its first regulations requiring the informed consent of human subjects. Tellingly, the sources on which our government relied in outlawing non-consensual human medical experimentation were the Nuremberg Code and the Declaration of Helsinki, which suggests the government conceived of these sources’ articulation of the norm as a binding legal obligation. Bassiouni et al., supra, at 1625-26 (citing 21 C.F.R. § 310.102(h) (1980)).[13] Today, FDA regulations require informed consent to U.S. investigators’ research, whether conducted domestically or in a foreign country, used to support applications for the approval of new drugs. See 21 C.F.R. §§ 50.20, 50.23-.25, 50.27, 312.20, 312.120 (2008); 45 C.F.R. §§ 46.111, 46.116 — .117 (2008).
The importance that the United States government attributes to this norm is demonstrated by its willingness to use domestic law to coerce compliance with the norm throughout the world. United States law requires that, as a predicate to FDA approval of any new drug, both American and foreign sponsors of drug research involving clinical trials, whether conducted here or abroad, procure informed consent from human subjects. 21 C.F.R. §§ 312.20, 312.120 (2008); see also Dep’t of Health & Human Servs., Office of Inspector Gen., The Globalization of Clinical Trials 5 (2001), http://www.oig.hhs.gov/ oei/reports/oei-01-00-00190.pdf. Sponsors conducting research under an Investigational New Drug Application (“IND”) are obligated to adhere to FDA regulations, which require informed consent. 21 C.F.R. § 312.20 (2008); The Globalization of Clinical Trials, supra, at 5. Prior to April 2008, sponsors conducting research under non-IND guidelines were obligated to adhere to the ethical principles of the 1989 version of the Declaration of Helsinki or the host country’s regulations, whichever offered greater protection to the human subject. 21 C.F.R. § 312.120 (2007); The Globalization of Clinical Trials, supra, at 5. The April 2008 revisions to the non-IND guidelines reaffirmed the informed consent requirement. Human Subject Protection: Foreign Clinical Studies Not Conducted Under an Investigational New Drug Application, 73 Fed.Reg. 22,800, 22,801, 22,803, *183 22,804, 22,816 (Apr. 28, 2008) (codified at 21 C.F.R. pt. 312). Foreign clinical studies not conducted under an IND must now comply with the Good Clinical Practice guidelines (“GCP”) promulgated by the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, 62 Fed.Reg. 25,692 (May 9, 1997), which require informed consent to medical experimentation. 21 C.F.R. § 312.120 (2008).
Additional international law sources support the norm’s status as customary international law. The European Union embraced the norm prohibiting nonconsensual medical experimentation through a 2001 Directive passed by the European Parliament and the Council of the European Union. The Directive accepted the informed consent principles of the 1996 version of the Declaration of Helsinki. Council Directive 2001/20/EC, preamble (2), 2001 O.J. (L 121) 37(EC) [hereinafter 2001 Clinical Trial Directive]. It also required member States to adopt rules protecting individuals incapable of giving informed consent and permitting clinical trials only where “the trial subject or, when the person is not able to give informed consent, his legal representative has given his written consent after being informed of the nature, significance, implications and risks of the clinical trial.” Id. at art. (1), (2)(d). The Directive further required all member States to implement by 2004 domestic laws, regulations, and administrative provisions to comply with its informed consent requirements. Id. at art. 22(1).
Since 1997, thirty-four member States of the Council of Europe have also signed the Convention on Human Rights and Biomedicine, a binding convention and a source of customary international law. Convention for the Protection of Human Rights and Dignity of the Human Being with regard to the Application of Biology and Medicine: Convention on Human Rights and Biomedicine, art. 5, 15-16, opened for signature Apr. 4, 1997, E.T.S. No. 164, http:// conventions.coe.int/Treaty/en/Treaties/ html/164.htm [hereinafter Convention on Human Rights and Biomedicine]; Convention on Human Rights and Biomedicine, Chart of Signatures and Ratifications as of Aug. 8, 2008, http://conventions.coe.inV Treaty/Commun/ChercheSig.asp? NT=164 & CM=8 & DF=8/8/2008 & CL=ENG. It provides that an “intervention in the health field may only be carried out after the person concerned has given free and informed consent to it” and that the informed consent of human subjects is required for their involvement in medical research. Convention on Human Rights and Biomedicine, supra, at art. 5.[14] In 2005, the General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) adopted the Universal Declaration on Bioethics and Human Rights, which requires “the prior, free, express and informed consent of the person concerned” for research-oriented treatments. Universal Declaration on Bioethics and Human Rights, UNESCO Gen. Conf. Res., at art. 6, 33rd Sess., 33 C/Resolution 36, (Oct. 19, 2005).
This history illustrates that from its origins with the trial of the Nazi doctors at Nuremburg through its evolution in international conventions, agreements, declarations, and domestic laws and regulations, the norm prohibiting nonconsensual medical experimentation on human subjects has become firmly embedded and has secured *184 universal acceptance in the community of nations. Unlike our dissenting colleague’s customary international law analysis, which essentially rests on the mistaken assumption that ratified international treaties are the only valid sources of customary international law for ATS purposes, see Dissent at 200-02, we reach this conclusion as a result of our review of the multiplicity of sources — including international conventions, whether general or particular, and international custom as identified through international agreements, declarations and a consistent pattern of action by national law-making authorities — that our precedent requires us to examine for the purpose of determining the existence of a norm of customary international law. Our dissenting colleague’s reasoning fails to engage the incompatibility of nonconsensual human testing with key sources of customary international law identified in Article 38 of the ICJ’s statute, most importantly international custom, as evidence of a general practice accepted as law, as well as the general principles of law recognized by civilized nations. See supra pp. 174-75.

ii Specificity

Sosa requires that we recognize causes of action only to enforce those customary international law norms that are no “less definite [in] content ... than the historical paradigms familiar when [the ATS] was enacted.” Sosa, 542 U.S. at 732, 124 S.Ct. 2739. The norm prohibiting nonconsensual medical experimentation on human subjects meets this requirement. In United States v. Smith, 18 U.S. (5 Wheat) 153, 159-61, 5 L.Ed. 57 (1820), Justice Story found that “whatever may be the diversity of definitions, ... all writers concur, in holding, that robbery or forcible depredations upon the sea ... is piracy.” Id. at 161. We have little trouble concluding that a norm forbidding nonconsensual human medical experimentation is every bit as concrete — indeed even more so — than the norm prohibiting piracy that Story describes, or interference with the right of safe conducts and the rights of ambassadors, which together are the paradigmatic norms identified in Sosa. Id. at 724, 124 S.Ct. 2739. The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least eighty-four States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.[15] The appellants allege that Pfizer knowingly and purposefully conducted such experiments on a large scale. Whatever uncertainty may exist at the margin is irrelevant here because appellants allege a complete failure on the part of Pfizer and the Nigerian government to inform appellants of the existence of the Trovan experiments. These allegations, if true, implicate Pfizer and the Nigerian government in conduct that is at the core of any reasonable iteration of the prohibition against involuntary *185 medical experimentation. While the prohibition in question applies to the testing of drugs without the consent of human subjects on the scale Pfizer allegedly conducted, we do not suggest that it would extend to instances of routine or isolated failures by medical professionals to obtain informed consent, such as those arising from simple negligence. The allegations in the complaints involve anything but a doctor’s routine or erroneous failure to obtain such consent from his patient.

Hi. Mutual Concern

Customary international law proscribes only transgressions that are of “mutual” concern to States — “those involving States’ actions performed ... towards or with regard to the other.” Flores, 414 F.3d at 249 (differentiating matters of “mutual” concern from those of “several” concern, in which “States are separately and independently interested”). Conduct that States have prohibited through domestic legislation is also actionable under the ATS as a violation of customary international law when nations of the world have demonstrated “by means of express international accords” that the wrong is of mutual concern. Filartiga, 630 F.2d at 888. An important, but not exclusive, component of this test is a showing that the conduct in question is “capable of impairing international peace and security.” Flores, 414 F.3d at 249. Appellants have made both of these showings.
As we have seen, States throughout the world have entered into two express and binding international agreements prohibiting nonconsensual medical experimentation: the ICCPR and the Convention on Human Rights and Biomedicine. The entry of over 160 States into these agreements and the European Union’s passage of the 2001 Clinical Trial Directive demonstrates that States have not only acted independently to outlaw large-scale, non-consensual drug testing on humans, but they have also acted in concert to do so. In other words, acting out of a sense of mutual concern, “the nations [of the world] have made it their business, both through international accords and unilateral action,” to demonstrate their intention to eliminate conduct of the type alleged in the complaints. Filartiga, 630 F.2d at 889.
The administration of drug trials without informed consent on the scale alleged in the complaints poses a real threat to international peace and security. Over the last two decades, pharmaceutical companies in industrialized countries have looked to poorer, developing countries as sites for the medical research essential to the development of new drugs. See James V. Lavery, Putting International Research Ethics Guidelines to Work for the Benefit of Developing Countries, 4 Yale J. Health Pol’y L. & Ethics 319, 320-21 (2004); The Globalization of Clinical Trials, supra, at 8.[16] Pharmaceutical companies recognize the potential benefits of drug trials to poor nations and have sought to promote access to medicines and health care in under-served populations through philanthropy and partnership with governments and NGOs. See, e.g., PhRMA, Press Releases: Worldwide Pharmaceutical Industry Launches Global Health Progress Initiative to Expand Efforts to Improve Health in Developing Countries (April 16, 2008), http://www.phrma.org/news.jroom/press_ releases/global_health_progress_initiative_ launched_to_improve_health_in_deve loping_countries/ (describing initiative by worldwide pharmaceutical industry to “fur *186 ther access to medicines; build capacity of health workers in developing nations; advocate for global action to address health challenges; and continue R & D to develop new tools to fight diseases that plague the developing world”); PhRMA, Profile2008: Pharmaceutical Industry 42 (2008), http:// www.phrma.org/files/2008% 20Profile.pdf (describing contributions by American pharmaceutical companies to the promotion of global access to medicines and health care). This trend offers the possibility of enormous health benefits for the world community. Life-saving drugs can potentially be developed more quickly and cheaply, and developing countries may be given access to cutting edge medicines and treatments to assist underresourced and understaffed public health systems, which grapple with life-threatening diseases afflicting their populations.[17]
The success of these efforts promises to play a major role in reducing the cross-border spread of contagious diseases, which is a significant threat to international peace and stability. The administration of drug trials without informed consent on the scale alleged in the complaints directly threatens these efforts because such conduct fosters distrust and resistance to international drug trials, cutting edge medical innovation, and critical international public health initiatives in which pharmaceutical companies play a key role. This case itself supplies an exceptionally good illustration of why this is so. The Associated Press reported that the Trovan trials in Kano apparently engendered such distrust in the local population that it was a factor contributing to an eleven month-long, local boycott of a polio vaccination campaign in 2004, which impeded international and national efforts to vaccinate the population against a polio outbreak with catastrophic results.[18] According to the World Health Organization, polio originating in Nigeria triggered a major international outbreak of the disease between 2003 and 2006, causing it to spread across west, central, and the Horn of Africa and *187 the Middle East, and to re-infect twenty previously polio-free countries.[19]
The administration of drug trials without informed consent also poses threats to national security by impairing our relations with other countries. Seven of the world’s twelve largest pharmaceutical manufacturers — a group that includes Pfizer — are American companies. Global 500, Fortune, July 21, 2008, http://money.cnn. com/magazines/fortune/global500/2008/ industries/21/index.html. Consequently, American companies are likely to be sponsors of medical experiments on human subjects abroad.[20] As this case illustrates, the failure to secure consent for human experimentation has the potential to generate substantial anti-American animus and hostility. Unsurprisingly, as noted above, see supra pp. 201-02, our government actively attempts to prevent this practice in foreign countries. For example, federal law requires that data generated from testing on human subjects abroad that is used to seek regulatory approval for a given drug must, at minimum, be the result of testing conducted consistent with the requirements of informed consent. Consequently, the U.S. government denies access to the U.S. market for any new drug unless the drug’s research data is generated in a manner consistent with the customary international law norm prohibiting drug trials on human subjects without informed consent.
For these reasons, we hold that the appellants have pled facts sufficient to state a cause of action under the ATS for a violation of the norm of customary international law prohibiting medical experimentation on human subjects without their consent. In such an instance, ATS jurisdiction exists over plaintiffs’ claims. The district court determined that the norm existed, but concluded that because no single source recognizing the norm was legally binding on the United States and created a private cause of action, it could not infer such a right under the ATS. Presumably, on this basis, it simultaneously held that there was no subject matter jurisdiction over plaintiffs’ claims. Under Sosa, this approach was not correct. Sosa makes clear that the critical inquiry is whether the variety of sources that we are required to consult establishes a customary international law norm that is sufficiently specific, universally accepted, and obligatory for courts to recognize a cause of action to enforce the norm. Nothing in Sosa suggests that this inquiry can be halted if some of the sources of international law giving rise to the norm are found not to be binding or not to explicitly authorize a cause of action.
We believe that the issues raised by this appeal regarding customary international *188 law are framed by our analysis and by that of our dissenting colleague. He contends that our analysis is created from “whole cloth.” Dissent at 191. We believe that his approach to customary international law is unselfconsciously reactionary and static. The approach does not accommodate itself to the normative world that, by their commitments and conduct over the past fifty years, states — including our own — have shown they believe to exist.

B. State Action

A private individual will be held liable under the ATS if he “acted in concert with” the state, i.e., “under color of law.” Kadic, 70 F.3d at 245. In making this determination, courts look to the standards developed for finding state action in claims brought under 42 U.S.C. § 1983. Id. Under § 1983, state action may be found when “there is such a ‘close nexus between the State and the challenged action’ that seemingly private behavior ‘may be fairly treated as that of the State itself.’ ” Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). That nexus may exist “where a private actor has operated as a willful participant in joint activity with the State or its agents,” Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 551-52 (2d Cir.2001) (quoting Loce v. Time Warner Entertainment Advance/Newhouse Partnership, 191 F.3d 256, 266 (2d Cir.1999)), or “acts together with state officials or with significant state aid,” Kadic, 70 F.3d at 245. Pfizer meets this test.
The Appellants have alleged that the Nigerian government was involved in all stages of the Kano test and participated in the conduct that violated international law. They allege that the Nigerian government provided a letter of request to the FDA to authorize the export of Trovan, arranged for Pfizer’s accommodations in Kano, and facilitated the nonconsensual testing in Nigeria’s IDH in Kano. Despite overcrowding due to concurrent epidemics, the Nigerian government extended the exclusive use of two hospital wards to Pfizer, providing Pfizer with control over scarce public resources and the use of the hospital’s staff and facilities to conduct the Kano test, to the exclusion of MSF.
The unlawful conduct is alleged to have occurred in a Nigerian facility with the assistance of the Nigerian government and government officials and/or employees from the IDH and Aminu Kano Teaching Hospital. Pfizer’s research team in Kano was comprised of three American physicians, Dr. Abdulhamid Isa Dutse (a physician in the Aminu Kano Teaching Hospital), and three other Nigerian doctors. The American and Nigerian members of Pfizer’s team allegedly jointly administered the Kano test. Finally, in addition to assisting with the Kano test, Nigerian officials are alleged to have conspired to cover up the violations by silencing Nigerian physicians critical of the test and by back-dating an “approval letter” that the FDA and international protocol required to be provided prior to conducting the medical experiment. In addition to these allegations, the Adamu plaintiffs explicitly allege that the Nigerian government “was intimately involved and contributed, aided, assisted and facilitated Pfizer’s efforts to conduct the Trovan test,” “acted in concert with Pfizer,” and, according to a Nigerian physician involved in the Trovan experimentation, appeared to “back[ ]” the testing. At the pleading stage, these contentions meet the state action test because they adequately allege that the violations occurred as the result of concerted action *189 between Pfizer and the Nigerian government.

II. Forum Non Conveniens

As an alternative to dismissal for failure to state a claim under the ATS, the district court dismissed the actions on the ground of forum non conveniens. Appellants raised this issue on appeal. Ordinarily, we review a forum non conveniens dismissal for abuse of discretion. Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir.2005). Since filing this appeal, however, Pfizer has notified the Court that in light of recent developments, in particular the initiation of proceedings by the federal government of Nigeria and the state of Kano against Pfizer and certain of its employees, it would not seek affirmance of the judgment on the basis of forum non conveniens. The appellants agreed and also requested that the issue be remanded. We accede to this request.
Although we are not now called upon definitively to review the district court’s application of forum non conveniens, in view of the frequency with which this issue has arisen and remained unsettled in this case, we offer additional guidance to assist the parties and the district court. The three-step analysis set forth in Iragorri v. United Techs. Corp., 274 F.3d 65, 71-75 (2d Cir.2001) (en banc), applies. In this litigation, the second step of the analysis, which requires the district court to consider the adequacy of the alternative forum, is pivotal. Dismissal is not appropriate if an adequate and presently available alternative forum does not exist. Norex, 416 F.3d at 159. A forum in which defendants are amenable to service of process and which permits litigation of the dispute is generally adequate. Id. at 157. Such a forum may nevertheless be inadequate if it does not permit the reasonably prompt adjudication of a dispute, if the forum is not presently available, or if the forum provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254-55 & n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); USHA (India), Ltd. v. Honeywell Int’l, Inc., 421 F.3d 129, 136 (2d Cir.2005); Norex, 416 F.3d at 160.
The defendant bears the burden of establishing that a presently available and adequate alternative forum exists, and that the balance of private and public interest factors tilts heavily in favor of the alternative forum. USHA (India), Ltd., 421 F.3d at 135; PT United Can Co. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 74 (2d Cir.1998). Absent a showing of inadequacy by a plaintiff, “considerations of comity preclude a court from adversely judging the quality of a foreign justice system.” PT United Can Co., 138 F.3d at 73. Accordingly, while the plaintiff bears the initial burden of producing evidence of corruption, delay or lack of due process in the foreign forum, the defendant bears the ultimate burden of persuasion as to the adequacy of the forum. See, e.g., Norex, 416 F.3d at 159-160.
When the district court granted Pfizer’s motion, it identified the pivotal issue as whether the plaintiffs produced sufficient evidence to show that Nigeria is an inadequate alternative forum. Abdullahi III, 2005 WL 1870811, at *15. Having found that they had not, it concluded that Nigeria was an adequate forum. Id. at *16-18. In so doing, the district court omitted an analysis of whether Pfizer discharged its burden of persuading the court as to the adequacy and present availability of the Nigerian forum and improperly placed on plaintiffs the burden of proving that the alternative forum is inadequate. Cf. DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 30 (2d Cir.2002) (holding that it is error *190 not “to hold defendants to their burden of proof’ of the Gilbert factors). On remand, the district court will have an opportunity to reassess this issue, as well as the relationship between Fed.R.Civ.P. 44.1 and the Federal Rules of Evidence.

III. Choice of Law

The district court dismissed the Adamu plaintiffs’ claims under the Connecticut Unfair Trade Practices Act and the Connecticut Products Liability Act on the ground that Connecticut choice of law principles applied and called for the application of Nigerian law. Adamu, 399 F.Supp.2d at 501-03. “We review the district court’s choice of law de novo.” Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir.2005).
The district court correctly determined that Connecticut choice-of-law rules applied because it was obligated to apply the state law that would have been applicable if the ease had not been transferred from Connecticut to New York. See Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Under Connecticut law, lex loci delicti, “the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury,” typically applies. O’Connor v. O’Connor, 201 Conn. 632, 637, 519 A.2d 13 (1986). Lex loci delicti would require the application of Nigerian law because the Adamu plaintiffs’ injuries are alleged to have occurred there. Connecticut, however, has conspicuously retreated from a rigid application of the doctrine. The Connecticut Supreme Court held that lex loci delicti does not apply to a tort claim when doing so would undermine expectations of the parties or an important state policy, produce an arbitrary and irrational result, or where “reason and justice” counsel for the application of a different principle. Id. at 637, 648, 650, 519 A.2d 13. In such cases, Connecticut courts are required to apply the “most significant relationship” analysis set forth in the Restatement (Second) of Conflict of Laws §§ 6 & 145 (1971) [hereinafter Restatement (Second)]. O’Connor, 201 Conn, at 649-50, 519 A.2d 13.
Section 145(1) of the Restatement provides that “[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.” Restatement (Second) § 145(1). Section 6(2), in turn, provides that where a state is not guided by a statutory directive on choice of law,
the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
Restatement (Second) § 6(2). The Connecticut Supreme Court has determined that Section 145(2) provides courts with guidance regarding the evaluation of the policy choices set out in Sections 145(1) and 6(2). O’Connor, 201 Conn. at 652, 519 A.2d 13. Section 145(2) assists with the *191 application of the principles of Section 6 to tort cases by calling for consideration of:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
Restatement (Second) § 145(2). These factors are “to be evaluated according to their relative importance with respect to the particular issue.” Id.
The district court correctly decided to apply Sections 6 and 145 of the Restatement rather than lex loci delicti. It applied the factors in Section 145(2) to determine whether Connecticut or Nigeria has the most significant relationship to the conduct at issue, which it identified as “Pfizer’s failure to inform the children or their parents about the potential problems with Trovan, and the administration of Trovan and low dosage of Ceftriaxone.” Adamu, 399 F.Supp.2d at 503 (citations omitted). It reasoned that “the Nigerian contacts to this litigation are stronger than Connecticut’s” and noted in particular that both the plaintiffs’ injuries and Pfizer’s alleged conduct occurred in Nigeria, that the plaintiffs were Nigerian residents, and that “the parties’ relationship is centered” in Nigeria. Id. It determined that most of the factors of Section 145(2) point toward applying Nigerian law and that the “sole basis” for the applicability of Connecticut law was that “Pfizer performed research and development with respect to Trovan and planned the experiment in Connecticut.” Id. For these reasons, it concluded that Nigeria’s interests were superior and that its law should apply. Id.
Although the district court correctly identified some of the pertinent factors, it ultimately erred in its application of the “most significant relationship” test because it did not factor into its Section 145(2) analysis the integral factors set out in Section 6(2). It did not, for example, discuss “the relevant policies of the forum” or “the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue.” Restatement (Second) § 6(2)(b)-(c). Nor did it analyze what “justified expectations” existed that could have prompted Pfizer reasonably to believe that its conduct in Connecticut would not expose it to Connecticut law, or how Pfizer would have been disadvantaged by litigating these claims in Connecticut. Id. § 6(2)(d). Finally, the district court did not evaluate its own ability to determine and apply Connecticut, as opposed to Nigerian, law. Id. § 6(2)(g). For these reasons, we vacate the dismissal of the state law claims and remand to the district court for further consideration.
CONCLUSION
For the foregoing reasons, we REVERSE the judgments of the district court and REMAND for further proceedings.
Judge WESLEY dissents in a separate opinion.

. Bacterial meningitis is a serious and sometimes fatal infection of the fluids surrounding the spinal cord and the brain. Centers for Disease Control and Prevention, Meningococcal Disease: Frequently Asked Questions (May 28, 2008), http://www.cdc.gov/ meningitis/bacterial/faqs.htm.

. The appellants further allege that Pfizer failed to follow its protocol in ways that might have mitigated the harm suffered by the children. They contend that Pfizer violated the protocol by administering Trovan orally even though oral absorption is difficult for sick children; conducting no testing prior to administering the drug to determine whether Nigeria's strain of meningitis might be responsive to Trovan; failing to determine that the children in the test had meningitis; and failing to either exclude from the experiment children with liver or joint problems or to test for such problems, even though Trovan was known to exacerbate them. Although Pfizer’s protocol called for children receiving Trovan to be switched to Ceftriaxone if they did not respond well to Trovan, Pfizer allegedly did not conduct regular blood tests of the children or switch those who suffered from Trovan-related side effects to Ceftriaxone.

. A Nigerian physician who was the principal investigator for the test allegedly admitted that his office created the backdated approval letter when the FDA conducted an audit of the experiment in 1997.

. Tina Akannam, Nigeria: Pfizer — Case Adjourned Till May 21, Vanguard, April 30, 2008, http://allafrica.com/stories/2008 04300470.html; Joe Stephens, Pfizer Faces Criminal Charges in Nigeria, The Washington Post, May 30, 2007, at A10, available at http:// www.washingtonpost.com/wp-dyn/contenl/ article/2007/05/29/AR2007052902107.html.

. Jonathan Clayton, Pfizer Under Fire After Drug Trial, TimesOnline, June 27, 2007, http://business.timesonline.co.uk/tol/business/ industry_sectors/health/article 1990908.ece; Nigeria Sues Drugs Giant Pfizer, BBC News, June 5, 2007, http://news.bbc.co.Uk/2/hi/ africa/6719141.stm.

. Twombly instituted a flexible "plausibility standard,” not limited to antitrust cases, which requires the amplification of facts in certain contexts. Iqbal v. Hasty, 490 F.3d 143, 155-58 (2d Cir.2007).

. These sources are located respectively at (1) United States v. Brandt, 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, 181 (1949) [hereinafter Nuremberg Trials]; (2) World Med. Ass'n, Declaration of Helsinki: Ethical Principles for Medical Research Involving Human Subjects, art. 20, 22, G.A. Res. (adopted 1964, amended 1975, 1983, 1989, 1996, and 2000), http://www.wma.net/e/ policy/pdPFed. Appx.c.pdf [hereinafter Declaration of Helsinki]; (3) Council for International Organizations of Medical Services [CIOMS], International Ethical Guidelines for Biomedical Research Involving Human Subjects, guideline 4 (3rd ed.2002), superseding id. at guideline 1 (2nd ed.1993); (4) International Covenant on Civil and Political Rights, art. 7, Dec. 19, 1966, 999 U.N.T.S. 171 [hereinafter ICCPR],

. The district court interchangeably refers to the "lack of jurisdiction” or "lack of subject matter jurisdiction” over plaintiffs' claims, the plaintiffs' failure to state an ATS claim, and their failure to identify a norm that permits the inference of a cause of action.

. The Fourth Geneva Convention, which entered into force in 1950 and provides protection to civilians in the time of war, elaborates on the application of the norm during armed conflict. Article 32 of the convention prohibits civilian or military agents of the state parties from conducting "medical or scientific experiments not necessitated by the medical treatment of the protected person.” Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 32, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. According to the commentary, "[protected persons must not in any circumstances be used as 'guinea pigs’ for medical experiments.” Commentary on the Geneva Conventions of 12 August 1949: TV Geneva Convention Relative to the Protection of Civilian Persons in Time of *180 War 224 (Oscar Uhler & Henri Coursier eds., 1958). This commentary explains that the prohibition is directly related to the first principle of the Nuremberg Code since "[i]n prohibiting medical experiments on protected persons, the Diplomatic Conference wished to abolish for ever the criminal practices from which thousands of persons suffered in the death camps of the [second] world war.” The practices involved human medical experiments that were objectionable because they were nonconsensual. See Brandt, 2 Nuremberg Trials, at 183. The convention is legally-binding on 194 states that have ratified it without reservation to Article 32. See International Committee of the Red Cross, Geneva Conventions of 12 August 1949 State Parties, Signatories, Reservations and Declarations, http://www.icrc.org/ihl.nsl7WebSign2Read Form & id=375 & ps=P.

. Although certain States-Parties to the ICCPR have made reservations or declarations with respect to Article 7's prohibition of torture and cruel, inhuman or degrading treatment or punishment, we are not aware of any similar qualification by a State-Party to the prohibition of medical or scientific experimentation without the free consent of human subjects. See Office of the United Nations High Commissioner for Human Rights, International Covenant on Civil and Political Rights, Declarations and Reservations, http:// www2.ohchr.org/englisb/bodies/ratification/ docs/Declarations ReservationsICCPR.pdf.

. Khulumani makes clear that treaties that the United States has neither signed nor ratified — let alone treaties like the ICCPR that the United States has signed but not ratified— may evidence a customary international law norm for ATS purposes where the treaty has been ratified widely and it is clear that the reason for the United States’s failure to subscribe to the treaty was unrelated to the particular norm in question. See Khulumani, 504 F.3d at 276, 276 n. 9 (Katzmann, J., concurring).

. The Department of Health and Human Services has compiled the laws, regulations, and guidelines governing human subjects research in eighty-four countries. See Office of Human Research Prot., Dep’t of Health & Human Servs., International Compilation of Human Subject Research Protections (2008), http://www.hhs.gov/ohrp/international/ HSPCompilation.pdf. It is uncontested that all of the countries identified in this compilation require informed consent to medical experimentation.

. The importance of informed consent to medical experimentation was reinforced with the passage of the National Research Act in 1974, which established the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. See National Research Act, Pub.L. 93-348, 88 Stat. 342 (codified as amended in scattered sections of 42 U.S.C.). This body issued the Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research in 1979, which identifies basic ethical principles governing biomedical and behavioral research on human subjects and requires informed consent. Nat'l Comm'n for the Prot. of Human Subjects of Biomedical & Behavioral Research, The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research, part C(l) (1979), available at http://ohsr.od.nih. gov/guidelines/belmonl.html# goc. Soon after-wards, the Department of Health, Education and Welfare (later renamed the Department of Health and Human Services) promulgated stricter regulations for ensuring informed consent in research conducted or supported by federal departments or agencies. See U.S. Dep’t of Health & Human Servs., Guidelines for the Conduct of Research Involving Human Subjects at the National Institutes of Health, 17-18 (5th ed.2004), http://ohsr.od. nih.gov/guidelines/GrayBooklet 82404.pdf (referencing 45 C.F.R. pt. 46, subpt. A (1981)).

. States-Parties to the Convention on Human Rights and Biomedicine are also required to afford "appropriate judicial protection” to prevent or end infringements of the rights protected by the Convention, including the right to informed consent to medical experimentation. Convention on Human Rights and Biomedicine, supra, at art. 23.

. At the fringe, disagreement exists over certain aspects of informed consent including, for example, the way to best secure consent from illiterate or otherwise vulnerable populations, see, e.g., Daniel W. Fitzgerald et al., Comprehension During Informed Consent in a Less-Developed Country, 360 The Lancet 1301, 1301-02 (2002), and whether informed consent is possible in double-blind experiments in which some subjects are given placebos, see, e.g., Timothy S. Jost, The Globalization of Health Law: The Case of Permissibility of Placebo-Based Research, 26 Am. J.L. & Med. 175, 183-86 (2000). These debates do not disturb the specificity of the basic norm at issue or the unanimity of world opinion against medical experimentation on human subjects without their consent.

. In the United States, for example, the number of foreign clinical investigators conducting drug research under an IND increased sixteen-fold in the 1990s. Globalization of Clinical Trials, supra, at 6.

. These benefits are well acknowledged. See, e.g., Remigius N. Nwabueze, Ethical Review of Research Involving Human Subjects in Nigeria: Legal and Policy Issues, 14 Ind. Int’l & Comp. L.Rev. 87, 102 (2003) (recognizing that clinical trials at times provide the only access to innovative and effective health care in developing countries); David Wendler, et al., The Standard of Care Debate: Can Research in Developing Countries Be Both Ethical and Responsive to those Countries’ Health Needs?, 94 Am. J. Pub. Health 923, 923 (2004) (noting dramatic inequalities in health care world-wide and the potential of drug research to better care for the world's poor).
Doctors Without Borders, the WHO, and other international health organizations, for example, have called for increased corporate research interest in developing countries. Sonia Shah, Globalizing Clinical Research, The Nation, June 13, 2002, at 3, http://www. thenation.com/doc/20020701/shah. Ruth Fa-den, a bioethicist at Johns Hopkins, stated, "What we need, if anything, is more health research in the developing world, not less.” Id. An HIV researcher observed that even when companies test drugs geared for patients in the developed world through trials in developing countries, the testing "brings benefits to the patients. They get special attention and potential therapy.” Id.

. Salisu Rabiu, Pfizer Asks Nigeria Court to Dismiss Case, The Associated Press, July 4, 2007, http ;//origin.foxnews .com/printer_ friendly_wires/2007Jul04/0,4675,Nigeria Pfizer,00.html (reporting that the boycott of the Kano polio vaccination program is believed to have "set back global eradication” of polio and to have "caus[ed] an outbreak that spread the disease across Africa and into the Middle East”). The boycott also impaired the efforts of American pharmaceutical companies to contribute to polio eradication by donating over 130 million doses of polio vaccine to sixteen African countries since 1997. PhRMA, Global Partnerships: Humanitarian Programs of the Pharmaceutical Industry in Developing Nations 4 (2004), http://www. phrma.org/files/Global_Partnerships_2004. pdf.

. World Health Organization, Poliomyelitis in Nigeria and West!Central Africa, June 18, 2008, http://www.who.in1/csr/don/2008_06_ 18/en/.
Other examples of the link between the cross-border spread of contagious disease and international peace and stability come to mind, such as the outbreak of anti-U.S. riots in South Korea as a result of fear that imported American beef will spread mad cow disease to that country. See Choe Sang-Hun, South Korea Lifts Ban on U.S. Beef, New York Times, June 26, 2008, http://www.nytimes. com/2008/06/26/world/asia/26korea.html.

. FDA data suggests the industry trend is to use foreign research to support applications for new drug approvals in the United States. Since 1990 there has been an explosion in the number of foreign clinical investigators conducting drug research that sponsors use for this purpose. In 1990, there were 271 foreign investigators conducting research in 28 countries in the FDA database. By 1999, the number had grown to 4,458 investigators working in 79 countries. Globalization of Clinical Trials, supra, at i.