In re SOUTH AFRICAN APARTHEID LITIGATION.

This Document Relates to:

Sakewe Balintulo, et al., Plaintiffs,

v.

Daimler AG, et al., Defendants.

No. 02 MDL 1499 (SAS).
No. 03 Civ. 4524 (SAS).

United States District Court, S.D. New York.

June 25, 2009.

Michael D. Hausfeld, Esq., Hausfeld LLP, Washington, DC, Steig D. Olson, Esq., New York, NY, Matt Schultz, Esq., Levin Papantonio Thomas Mitchell Echsner & Proctor, P.A., Pensacola, FL, Robert G. Kerrigan, Esq., Kerrigan, Estess, Rankin & McLeod, LLP, for Plaintiffs Balintulo et al.

Michael Gerard, Esq., Mark David McPherster, Esq., Morrison Foerster, New York, NY, Jack W. Londen, Esq., Peter J. Stern, Esq., Morrison & Foerster, LLP, Chiyodaku, Tokyo, Japan, for Defendant Fujitsu Limited.

## OPINION & ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Two actions brought on behalf of massive classes of South Africans ("plaintiffs") assert that several multinational corporations ("defendants") aided and abetted torts in violation of customary international law. Plaintiffs claim jurisdiction in United States courts under the Alien Tort

Claims Act ("ATCA").[1] These lawsuits address the obligations of corporations under the law of nations, the role of American courts in enforcing universal norms of international law, and the legacy of South African apartheid.

The long procedural history of these cases dates back to the filing of complaints in 2002. On April 8, 2009, this Court granted in part and denied in part defendants' consolidated motion to dismiss these actions in their entirety.[2] Specifically, this Court dismissed plaintiffs' claims against Fujitsu Limited with leave to replead.[3] On May 19, 2009, the *Balintulo* plaintiffs submitted a Corrected Second Amended Complaint ("CSAC"), which now governs their action. Fujitsu now moves to dismiss the claims against it on the basis that plaintiffs have not presented plausible allegations of an agency relationship between Fujitsu and International Computers Limited ("ICL"), the company whose actions form the core of the relevant allegations.[4] For the reasons stated below, Fujitsu's motion to dismiss is granted.

## II. BACKGROUND

### A. ICL Sales to South Africa

Plaintiffs contend that ICL supplied the South African government with computers used "to restrict Black people's movements within the country, to track non-whites and political dissidents, and to target individu-als for the purpose of oppressing the Black population and perpetuating the apartheid system."[5] Specifically, in 1965 ICL contracted with the South African government to design, implement, and service a customized computer system used to implement South Africa's racial pass laws, a crucial component of apartheid.[6] In 1967, ICL installed a computer at the Bantu Reference Bureau, which maintained geographic population control and served as an arm of the central government in the racially segregated townships.[7] In 1976, ICL delivered a more advanced computer to upgrade the existing system, despite protests in the United Kingdom.[8]

After the passage of United Nations resolutions concerning trade with South Africa and implementation of a partial trade embargo by the United States in the late 1970s, South Africa organized a front organization called Infoplan to procure technical equipment for the security forces.[9] ICL maintained links with Infoplan and continued to supply the South African security forces with technology products, despite the imposition of international sanctions.[10] In 1982, the United States fined ICL for selling computers containing U.S.-origin disk drives to the South African Police, in violation of U.S. trade restrictions.[11]

In 1986, the South African Government

---

1. 28 U.S.C. § 1350. This provision is alternatively known as the Alien Tort Statute ("ATS").

2. *See In re S. Afr. Apartheid Litig.* (*"Apartheid II"*), 617 F.Supp.2d 228 (S.D.N.Y.2009).

3. *See Apartheid II,* 617 F.Supp.2d at 276 & n. 283.

4. *See* Memorandum of Law in Support of Defendant Fujitsu Limited's Motion to Dismiss Plaintiffs' Second Amended Complaint ("Def. Mem.") at 9–21.

5. CSAC ¶ 172.

6. *See id.* ¶¶ 182–186, 189–191.

7. *See id.* ¶¶ 187–188.

8. *See id.* ¶¶ 194–195

9. *See id.* ¶¶ 197–198.

10. *See id.* ¶¶ 195–198.

11. *See id.* ¶ 202.

repealed the pass laws.[12] Although a formal agreement for non-racial elections was made in 1993, the apartheid regime did not officially end until 1994 with the election of Nelson Mandela in the first universal suffrage general election in South African history.[13]

### B. The Relationship Between Fujitsu and ICL

Fujitsu is an information technology and electronics corporation headquartered in Tokyo, Japan.[14] One of Fujitsu Limited's many subsidiaries is Fujitsu Services Limited ("Fujitsu Services"), which is the successor corporation of ICL.[15] In 1981, ICL began a collaborative relationship with Fujitsu, under which ICL received advanced access to Fujitsu semiconductor technology.[16] This technology was "crucial to ICL's continued supply of computers in South Africa."[17] In light of this relationship, Fujitsu "implemented elaborate guidelines about procedures to ensure it was knowledgeable about actions taken at ICL."[18] Over the course of the next twenty years, Fujitsu's relationship with ICL deepened, and plaintiffs allege that "Fujitsu's management played an increasing role in directing ICL's business activities."[19] In 1990, Fujitsu acquired an eighty-percent stake in ICL, and by 1998 Fujitsu had

complete ownership.[20] "In 2001, ICL changed its name to Fujitsu Services Ltd."[21]

### III. APPLICABLE LAW

### A. Motion to Dismiss—Rule 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[22] and "draw all inferences in the light most favorable to the non-moving party[ ]."[23] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[24]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[25]

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[26] To survive a 12(b)(6)

---

12. See Identification Act 72 of 1950, § 23 (S. Afr.).

13. See CSAC ¶¶ 81–82.

14. See id. ¶ 32.

15. See id.

16. See id. ¶ 200.

17. Id.

18. Id. ¶ 201.

19. Id. ¶¶ 201–202.

20. See id. ¶ 172 n. 117.

21. Id.

22. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

23. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007).

24. Id. (quotation omitted).

25. ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007).

26. Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[27]

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."[28]

## B. Vicarious Liability

■■■■ "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents ... in the scope of their authority."[29] "[J]ust as one corporation can hire another to act as its agent, a parent can commission its subsidiary to do the same."[30] However, "a parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock."[31] The level of control necessary to form a principal-agent rela-

tionship between a parent company and subsidiary "defies resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific."[32] Under federal common law,

the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.[33]

Circumstantial evidence of a principal-agent relationship includes the exclusive dedication of a subsidiary to assisting the parent company, payment of the subsidiary's expenses by the parent company, and requests for approval of the parent company for important decisions by the subsidiary.[34]

■■■■ Even if a purported agent lacks actual authority, a principal is nonetheless

---

**27.** See Twombly, 550 U.S. at 564, 127 S.Ct. 1955. Accord Ashcroft v. Iqbal, —— U.S. ——, 129 S.Ct. 1937, 1941, 173 L.Ed.2d 868 (2009) (noting the Twombly plausibility requirement is not limited to antitrust cases).

**28.** Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 556–57, 127 S.Ct. 1955).

**29.** Meyer v. Holley, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003).

**30.** Royal Indus. Ltd. v. Kraft Foods, Inc., 926 F.Supp. 407, 413 (S.D.N.Y.1996).

**31.** Restatement (Third) of Agency § 1.01 cmt. f(2) (citing United States v. Bestfoods, 524 U.S. 51, 62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)).

**32.** Transamerica Leasing, Inc. v. Republica de Venezuela, 200 F.3d 843, 849 (D.C.Cir.2000) (quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 633, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)).

**33.** Id. (citing Restatement (Second) of Agency § 1). Accord Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 702–03 (2d Cir.1990) (establishing similar standards concerning express and implied agency).

**34.** See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95–96 (2d Cir.2000). See also In re Parmalat Secs. Litig., 375 F.Supp.2d 278, 295 (S.D.N.Y.2005) (seeking "direction and help" from the parent company creates a plausible inference of agency).

liable "if it ratified the illegal acts."[35] "'Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'"[36] The acts of an agent are imputed to the principal "if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself."[37] Even mere acquiescence is sufficient to infer adoption of wrongdoing.[38] "Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done."[39]

## IV. DISCUSSION

■ Only a limited period of time is relevant to the claim that ICL acted as Fujitsu's agent when providing substantial assistance to violations of customary international law committed by the apartheid-era South African government. On the one hand, "ICL's relationship with Fujitsu began in 1981."[40] On the other hand, the pass laws were repealed in 1986. This Court previously held that

> the sale of computers to the South African Defense Forces does not constitute aiding and abetting any and all violations of customary international law that the military committed, as computers are not the means by which those violations were carried out.[41]

Therefore broader allegations of ICL sales to South Africa after 1986—including the entire period during which Fujitsu held an ownership stake in ICL—are irrelevant to plaintiffs' surviving claim concerning aiding and abetting the crime of apartheid.[42] Three of the four dated events referenced in the Complaint occurred in the 1960s and 1970s. The only dated activity post-dating the formation of the relationship between Fujitsu and ICL is the levying of fines by the United States against ICL in 1982 for the sale of U.S.-origin computer equipment to the South African Police.[43] This sole allegation is buttressed by alleged improvement and maintenance activities performed by ICL personnel on the existing pass law computer systems.

---

**35.** *Phelan v. Local 305 of the United Ass'n of Journeymen,* 973 F.2d 1050, 1062 (2d Cir. 1992). *Accord Doro v. Sheet Metal Workers Int'l Ass'n,* 498 F.3d 152, 156 (2d Cir.2007) (recognizing that common law agency principles extend the right to sue a principal that ratifies the illegal act of an agent).

**36.** *Hamm v. United States,* 483 F.3d 135, 140 (2d Cir.2007) (quoting Restatement (Second) of Agency § 82 (1958)). *Accord Phelan,* 973 F.2d at 1062 ("Ratification occurs 'when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.'" (quoting *Rodonich v. House Wreckers Union Local 95,* 817 F.2d 967, 973 (2d Cir.1987))).

**37.** *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936).

**38.** *See In re Bennett Funding Group,* 336 F.3d 94, 101 (2d Cir.2003).

**39.** *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,* 26 F.3d 370, 375 (2d Cir. 1994). *Accord Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385, 1388 (9th Cir.1987) (noting that attempting to conceal an agent's misdeeds rather than remedy them supports an inference of ratification).

**40.** CSAC ¶ 200.

**41.** *Apartheid II,* 617 F.Supp.2d at 269.

**42.** *See id.* (dismissing plaintiffs' claims against Fujitsu concerning "extrajudicial killing, torture, prolonged unlawful detention, and CIDT").

**43.** Although it is possible that the 1982 fine concerned sales prior to 1981 or sales unrelated to the pass law system, on a motion to dismiss the Court may infer in plaintiffs' favor that the fine evinces relevant sales.

Although plaintiffs' allegations would undoubtedly be sufficient to state a cause of action against ICL, plaintiffs have failed to sufficiently tie these activities to Fujitsu. The relevant relationship between ICL and South Africa concerned the design and maintenance of systems that predated any relationship with Fujitsu. Nor have plaintiffs alleged that Fujitsu had the right to command ICL to sever that long-term relationship. Although Fujitsu allegedly maintained a preferential supply agreement with ICL and monitored the use of Fujitsu technology, these claims do not support a broad inference that ICL acted as Fujitsu's agent, pursuant to Fujitsu's control. An otherwise unsupported assertion that this supply relationship correlated with Fujitsu management playing "an increasing role in directing ICL's business activities" does not suffice to sustain a plausible claim that ICL acted as Fujitsu's agent in carrying out sales in South Africa, particularly concerning a preexisting customer relationship.[44]

The insufficiency of plaintiffs' allegations against Fujitsu is clearest when compared to the claims lodged against Ford, GM, Daimler, and IBM. This Court previously found that plaintiffs' allegations against those companies are sufficient to state a claim derived from vicarious liability for the acts of an agent.[45] For example, plaintiffs alleged that Ford South Africa "relied on American management"—noting the precise position held by American personnel—"and used parts shipped from Ford Canada and Ford England, in order to sell Ford vehicles without running afoul of U.S. trade restrictions."[46] Similarly, plaintiffs alleged that "IBM engaged in a campaign to deliver products to South Africa in circumvention of export controls implicitly involving U.S. management."[47] The provision of financial and technical support is categorically different from the installation of management personnel in a subsidiary or consultation with a parent company's executives, as only the latter suggests authority to direct or control the alleged agent.

Plaintiffs have failed to state a claim against Fujitsu for substantially assisting the violations of customary international law carried out by the apartheidera government of South Africa. Therefore, plaintiffs' claims against Fujitsu must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Fujitsu's motion to dismiss is granted. Absent significant new allegations concerning ties between Fujitsu and ICL, any request for leave to amend the Corrected Second

44. CSAC ¶ 200. Although Plaintiffs cite the Second Circuit's recent decision in *Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir.2009), in support of the sufficiency of their allegations, *see* Def. Mem. at 9–10, *Abdullahi* is inapposite. In addressing the analytically distinct question of whether Pfizer acted under the color of law, the plaintiffs in *Abdullahi* offered significantly more specific allegations concerning Pfizer's links to the Nigerian government with regard to the particular incident. *See* 562 F.3d at 188 (noting that the Nigerian government "provided a letter of request to the FDA," "extended the exclusive use of two hospital wards," "provid[ed] Pfizer with control over scarce public resources and the use of the hospital's staff and facilities," and "conspired to cover up the violations by silencing Nigerian physicians critical of the test and by back-dating an 'approval letter,' " as well as providing more general backing).

45. *See Apartheid II*, 617 F.Supp.2d at 274–76.

46. *Id.* at 274 (citing Complaint, *Ntsebeza v. Daimler A.G.*, Nos. 02 Civ. 4712, 02 Civ. 6218, 03 Civ. 1024 ("*Ntsebeza* Complaint"), ¶¶ 101–102).

47. *Id.* at 275 (citing *Ntsebeza* Complaint ¶¶ 129–130, 140).

Amended Complaint will be denied as futile. The Clerk of the Court is ordered to close this motion (02 MDL 1499, No. 153, and 03 Civ. 4524, No. 83).

SO ORDERED.