*Abu Nahl v. Abou Jaoude*

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2019

Argued: April 28, 2020     Decided: July 30, 2020

Docket No. 19-1467

GHAZI ABU NAHL, ON BEHALF OF LEBANESE CANADIAN BANK, NEST INVESTMENTS HOLDING LEBANON SAL, ON BEHALF OF LEBANESE CANADIAN BANK,

*Plaintiffs-Appellees,*

— v. —

GEORGES ZARD ABOU JAOUDE, MOHAMAD HAMDOUN, AHMAD SAFA,

*Defendants-Appellants,*

LEBANESE CANADIAN BANK,

*Nominal-Defendant.*[*]

B e f o r e :

WALKER, POOLER, and LYNCH, *Circuit Judges*.

---

[*] The Clerk of the Court is respectfully directed to amend the caption as set forth above.

Defendants-Appellants bring this interlocutory appeal from an order of the United States District Court for the Southern District of New York (Schofield, *J.*), granting Plaintiffs-Appellees' ("Plaintiffs") motion to amend their complaint. The district court held that the prohibition against financing terrorism is a universal, specific, and obligatory norm of international law, allowing Plaintiffs to proceed with this suit brought under the Alien Tort Statute. Assuming *arguendo* that the district court was correct in holding that the prohibition could in some circumstances support a cause of action, we nevertheless conclude that Plaintiffs' effort to amend their complaint is futile, because any such international norm prohibiting terrorist financing cannot support a cause of action for the harm allegedly suffered by Plaintiffs. The order of the district court is therefore **REVERSED** and the case **REMANDED**.

Judge WALKER concurs, and files a concurring opinion.

CHRISTIAN J. PISTILLI (Anthony Herman, Dennis B. Auerbach, Andrew E. Siegel, *on the brief*), Covington & Burling LLP, Washington, DC, *for Plaintiffs-Appellees.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, DC, *for Defendants-Appellants.*

GERARD E. LYNCH, *Circuit Judge*:

The Alien Tort Statute ("ATS") is a jurisdictional statute authorizing foreign nationals to bring suit in federal court for torts committed in violation of international law. *See* 28 U.S.C. § 1350. International law "does not stem from any single, definitive, readily-identifiable" authority, but rather emerges from a

number of sources, including treaties and the widespread practices and legal beliefs of states (i.e., customary international law). *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir. 2003). When the rules produced by these various sources are specifically defined and widely accepted among nations, such rules may be added to the collection of international law principles violations of which are actionable under the ATS. In this appeal, the parties ask us to consider whether the prohibition against financing terrorism has reached such a status in international law, and thus confers a cause of action on the plaintiffs under the circumstances alleged in the complaint.

Plaintiffs-Appellees are Ghazi Abu Nahl ("Abu Nahl"), a Jordanian businessman, and Nest Investments Holding Lebanon SAL, a Lebanese corporation principally owned by Abu Nahl (collectively "Plaintiffs"). Plaintiffs bring this suit as shareholders on behalf of Lebanese Canadian Bank ("LCB" or "the Bank"), in which Plaintiffs owned a 24 percent stake. Defendants-Appellants held management positions at LCB. Georges Zard Abou Jaoude ("Abou Jaoude") was the chairman and general manager of the Bank, Mohamad Hamdoun ("Hamdoun") was the deputy general manager, and Ahmad Safa was the

assistant general manager (collectively "Defendants"). Abou Jaoude and Hamdoun owned approximately 76 percent of LCB.

LCB, at one time the eighth-largest bank in Lebanon, was liquidated in 2011 after the United States designated it "a financial institution of primary money laundering concern." J. App'x 688 ¶95. Plaintiffs allege that Defendants used LCB to facilitate a money-laundering scheme benefitting Hezbollah, the Lebanese militant organization, which used the laundered funds to carry out terror attacks on civilians. *See, e.g.*, Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650, 52,650 (Oct. 8, 1997) (designating Hezbollah a terrorist organization). Plaintiffs bring this shareholder derivative suit against Defendants to recover compensation for damages suffered by the Bank when Defendants' money laundering in support of terrorism came to light, including the imposition of financial sanctions by the United States. Plaintiffs contend that Defendants' conduct violated an actionable norm of international law that confers a cause of action on them over which the federal courts have jurisdiction under the ATS. The district court (Schofield, *J.*) held that the prohibition against financing terrorism is a viable basis for an ATS claim. Assuming, without deciding, that under some circumstances it may be, we REVERSE and REMAND

4

this case because any such international norm prohibiting financing terrorism does not confer a cause of action on Plaintiffs for the harm they allege.

## BACKGROUND

### I.      The Money-Laundering Operation

Plaintiffs allege that Defendants engaged in the money-laundering scheme at issue in collaboration with Ayman Saied Joumaa ("Joumaa") and Oussama Salhab ("Salhab").[1] Joumaa directs an international drug trafficking and money-laundering network, with roots in South America and West Africa; Salhab is a Hezbollah operative running a network of money couriers out of West Africa. The scheme worked as follows. From 2007 to 2011, Joumaa, Salhab, and Mahmoud Hassan Ayash, another Hezbollah operative, sent hundreds of millions of dollars from LCB accounts to thirty used car purchasers in the United States. The purchasers used the funds to buy cars that were then shipped to various locations in West Africa for sale. Upon arrival, Joumaa and Salhab's networks purchased the cars using money from narcotics sales in Europe and

---

[1] We draw the facts presented in this opinion from the second amended complaint and its appended documents, assuming their truth for the purposes of this appeal. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).

Africa. After the cars were sold, Salhab's money couriers would transport the payments from West Africa to Lebanon for deposit into LCB accounts, often paying a fee to Hezbollah to provide security during transport.

For their part, Defendants established systems within LCB to ensure that these transactions would not be detected, for example, by exempting certain accounts from the requirement that cash deposits in excess of $10,000 disclose the source of the funds. Defendants also allowed Hezbollah to maintain LCB bank accounts and ignored "requirements that would have prohibited LCB from conducting fund transfers on behalf of Hezbollah." J. App'x 680 ¶68. In total, Defendants "permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds." *Id.* at 679 ¶64. During the relevant period, Hezbollah carried out numerous terror attacks on civilians and served as the "muscle" for the Syrian government in the Syrian civil war that broke out in early 2011.

In February 2011, the United States Department of the Treasury ("Treasury Department") identified LCB as "a financial institution of primary money laundering concern" and found that Hezbollah "derived financial support from the criminal activities" of the drug-trafficking and money-laundering networks

operating through LCB. *Id.* at 559-60. The Treasury Department further concluded that LCB management, including Abou Jaoude and Hamdoun, were "complicit" in the laundering. *Id.* at 560. In March 2011, shortly after the Treasury Department designation, LCB's board of directors agreed to sell all of its assets and liabilities to another Lebanese bank, the Société Générale de Banque au Liban S.A.L. Upon execution of the sale, LCB placed itself into liquidation proceedings. Pursuant to the sale agreement, $150 million was deposited into an interbank account in the United States to be held in escrow. In December 2011, the United States Attorney for the Southern District of New York initiated civil forfeiture proceedings against LCB and seized the escrow funds. Acting as trustees for the liquidated bank, Abou Jaoude and Hamdoun eventually settled the action with an agreement to forfeit $102 million to the United States.

In the years preceding LCB's liquidation, Abu Nahl repeatedly raised concerns about the bank's compliance practices, both internally and with the Central Bank of Lebanon, to no avail. After liquidation, Plaintiffs and Defendants engaged in a significant amount of litigation in the Lebanese courts, including a shareholder action brought by Abu Nahl seeking damages related to the gross

mismanagement of the Bank. In 2016, a Lebanese trial court ruled in favor of Defendants in the shareholder action, a decision that is currently on appeal.[2]

## II. Procedural History

In addition to seeking relief in the Lebanese courts, Plaintiffs initiated the instant proceedings in the Southern District of New York. Their first amended complaint ("FAC") raised an ATS claim, alleging that Defendants' money laundering aided and abetted Hezbollah's violations of international law, i.e., its targeting of civilians in violent attacks. The district court granted Defendants' motion to dismiss the FAC, reasoning that because Plaintiffs had not been victims of Hezbollah's violations of international law they could not establish tort liability using those attacks as the primary substantive violation of international law. *See Abu Nahl v. Abou Jaoude*, No. 15-cv-9755, 2018 WL 2994391, at *4-5 (S.D.N.Y. June 14, 2018).

The district court allowed Plaintiffs to replead, suggesting that it might be amenable to a claim that alleged a primary violation of international law by Defendants. Plaintiffs availed themselves of the opportunity and filed a second

---

[2] So far as the record before us reflects, none of the cases litigated in the Lebanese courts have been resolved in favor of Plaintiffs, though several remain pending.

amended complaint ("SAC"). Abandoning the aiding and abetting theory, the SAC names Defendants as primary tortfeasors, who violated international law in their own right by laundering money in support of terrorism. The district court found that this revised ATS claim established a cause of action because it alleged the violation of a sufficiently universal, specific, and obligatory norm of international law: the prohibition against financing terrorism. Concluding that the proposed amendment was not futile, the court granted Plaintiffs' motion to amend their complaint. *See Abu Nahl v. Abou Jaoude*, 354 F. Supp. 3d 489, 508 (S.D.N.Y. 2018).

At Defendants' request, the district court certified for interlocutory appeal the portion of its order finding that the prohibition against financing terrorism is an actionable norm of international law under the ATS. A motions panel of this Court subsequently granted leave to appeal.

## DISCUSSION

When a district court certifies a question of law for interlocutory appeal, "we assume jurisdiction over the entire order, not merely over the question as framed by the district court" and may "review any issue fairly included within the certified order." *Donohue v. Milan*, 942 F.3d 609, 615 (2d Cir. 2019) (internal

9

quotation marks omitted). We review de novo a district court's decision that a proposed amendment to a complaint is not futile. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). Whether an alleged norm of international law provides a basis for jurisdiction under the ATS is also subject to de novo review. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

## I. Legal Framework

The ATS was enacted by the first Congress as part of the Judiciary Act of 1789 and has remained largely unchanged since that time. *See id.* at 125 n.27. In its entirety, the ATS reads:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. The ATS is a jurisdictional statute, creating no new cause of action in its own right but empowering courts to hear cases brought by foreign nationals based on violations of international law. *Kiobel*, 621 F.3d at 125.

The ATS was originally addressed to "the modest number of international law violations with a potential for personal liability" existing in 1789, namely, offenses against ambassadors, violations of safe conduct, and cases of piracy. *See*

10

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). But the content of international law is not stagnant, and the ATS is not a statute frozen in time. When considering whether an alleged norm of international law provides a cause of action under the ATS, "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir. 1980).

In *Sosa v. Alvarez-Machain*, the Supreme Court laid out the framework under which we decide whether a norm has attained sufficient stature in international law to provide a cause of action for an ATS claim. *See* 542 U.S. at 732-33. Under *Sosa*, a norm is actionable once it obtains the same "definite content and acceptance among civilized nations [as] the historical paradigms familiar when § 1350 was enacted." *Id.* at 732. Thus, "[c]ourts are obligated to examine how the specificity of the norm compares with 18th-century paradigms, whether the norm is accepted in the world community, and whether States universally abide by the norm out of a sense of mutual concern." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176 (2d Cir. 2009). This last requirement ensures that the ATS encompasses only those "wrongs that are of *mutual*, and not merely *several*, concern to States." *Flores*, 414 F.3d at 249 (internal quotation marks and

11

alterations omitted). Broadly stated, matters of mutual concern are those that might arise between "States in their dealings with each other" (such as war crimes), *id.* at 253 n.28, while matters of several concern are actions with which many states are independently concerned (such as murder). *Id.* at 249.

Our work is not done, however, once we conclude that a norm is sufficiently universal, specific, and obligatory. Before recognizing a norm, *Sosa* also requires courts to consider whether any prudential concerns counsel against doing so. Such prudential concerns might include, for example, "the practical consequences of making th[e] cause available to litigants in the federal courts" or foreign policy concerns raised by the executive branch regarding the recognition of a new norm. *Sosa*, 542 U.S. at 728, 732-33. While courts may recognize new norms as international law continues to develop, this second step of *Sosa* emphasizes the need for "great caution in adapting the law of nations to private rights." *Id.* at 728. Under this framework, we have recognized several norms of international law as actionable under the ATS, including the prohibitions against war crimes, torture, slavery, and genocide. *Abdullahi*, 562 F.3d at 172-73; *Kadic v. Karadžić*, 70 F.3d 232, 241-44 (2d Cir. 1995).

Defendants argue that in the years since *Sosa* was decided, the Supreme Court has restricted the power of the courts to recognize new norms of international law. Relying primarily on *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), Defendants contend that "absent express legislative authorization, courts are not free to imply . . . a new international-law remedy under the ATS." Appellant's Br. at 32 (emphasis omitted). Defendants considerably over-read *Jesner*. The Supreme Court in that case indeed put significant emphasis on *Sosa*'s second step, even going so far as to suggest that "the foreign-policy and separation-of-powers concerns inherent in ATS litigation" could be argued to mean that "a proper application of *Sosa* would preclude courts from ever recognizing any new causes of action under the ATS." 138 S. Ct. at 1403. But the Court expressly declined to reach such a broad conclusion. *See id.* ("[T]he Court need not resolve that question in this case."). While *Jesner* augments *Sosa*'s call for judicial restraint, it does not go so far as to "overrule *Sosa*'s framework or treat it as optional." *Id.* at 1414 (Gorsuch, J., concurring in part and concurring in the judgment).

## II.     Prohibition Against Financing Terrorism

Plaintiffs' ATS claim is based on Defendants' alleged violation of the

prohibition against financing terrorism, as expressed in Article 2.1(b) of the

International Convention for the Suppression of the Financing of Terrorism, Dec.

9, 1999, T.I.A.S. No. 13,075, 2178 U.N.T.S. 197 (the "Convention"). Article 2.1(b)

provides:

> 1.    Any person commits an offence within the meaning of
>        this Convention if that person by any means, directly or
>        indirectly, unlawfully and wilfully, provides or collects
>        funds with the intention that they should be used or in
>        the knowledge that they are to be used, in full or in part,
>        in order to carry out:
>
>        . . .
>
>        (b)    Any other act intended to cause death or serious
>               bodily injury to a civilian, or to any other person
>               not taking an active part in the hostilities in a
>               situation of armed conflict, when the purpose of
>               such act, by its nature or context, is to intimidate a
>               population, or to compel a government or an
>               international organization to do or to abstain
>               from doing any act.

The district court found that the prohibition against financing terrorism is

an actionable norm under the ATS, noting that a significant majority of nations

were party to the Convention during the relevant time period and that Article

2.1(b) specifically defines the prohibited conduct. *See Abu Nahl*, 354 F. Supp. 3d at

499-503; *see also Kiobel*, 621 F.3d at 137 (confirming that a treaty may constitute

14

sufficient proof of a norm "if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles") (emphasis omitted)).

On appeal, the parties focus their arguments on the universality, specificity, and scope of the norm.[3] Defendants contend that the norm is not sufficiently universal or specific, pointing out that a number of states joined the Convention with reservations and arguing that because "terrorism" is not well defined, a norm based on financing terrorism cannot be specific. Plaintiffs respond by noting that 173 nations were party to the Convention at the relevant time, that the vast majority of reservations were addressed to other provisions of the Convention, and that Article 2.1(b) explicitly describes the prohibited conduct and does not rely on a loosely defined concept of "terrorism."

These are complex issues that we need not decide to resolve this case. We thus take no position on whether the prohibition against financing terrorism, as expressed in Article 2.1(b) of the Convention, is sufficiently universal, specific,

---

[3] Defendants also argue that Plaintiffs were required to plead state action but failed to do so, and that the enactment of the Anti-Terrorism Act, *see* 18 U.S.C. § 2333, implicitly "shut the door" on ATS claims for injuries caused by acts of terrorism. Appellant's Br. at 24. We do not reach those questions because their resolution is not necessary to our disposition of the case.

and obligatory to give rise to civil liability that may be obtained under the ATS in some circumstances. Assuming *arguendo* that the prohibition is sufficient to support a civil cause of action under some circumstances, we conclude that the ATS claim in Plaintiffs' amended complaint is nevertheless futile. Whether or not a cause of action might lie, for example, in favor of victims of terrorist acts against persons who financed those acts by a money-laundering scheme of the sort alleged in Plaintiffs' complaint, we conclude that the prudential concerns emphasized in *Sosa* and *Jesner* militate strongly against recognizing a cause of action for Plaintiffs here. Plaintiffs ask us to establish a civil remedy for those who suffered a purely financial injury, inflicted not by the terrorist acts that are the target of the Convention, but by the mismanagement of a corporation by corporate officers who engaged in criminal activities that resulted in crippling financial sanctions. The ATS cannot and should not be stretched so far.

## III.    Plaintiffs' Cause of Action

The ATS authorizes foreign plaintiffs to bring suit to recover for a tort committed in violation of the law of nations. *See* 28 U.S.C. § 1350. As discussed above, this is not a broad jurisdictional grant, and historically covered only the "narrow set of violations of the law of nations" that could be committed by

16

individuals, were amenable to judicial remedy, and "threaten[ed] serious consequences in international affairs." *Sosa*, 542 U.S. at 715. The ATS allows foreign nationals access to United States courts precisely because of the international flavor of the harm they have suffered – hence the requirement that the norm be of mutual, rather than several, concern to the nations of the world. *See Abdullahi*, 562 F.3d at 176.

Implicit in this limited jurisdictional statute is the requirement that the tort alleged be grounded in the international norm claimed to be violated. It is a general principle of tort law that "[a]n actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 29 (AM. LAW INST. 2010); *see Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40, 60 (2d Cir. 2007). In this case, the international community came together to prohibit terrorist financing to curtail the risks of terrorism, seeking to prevent harm to those who might otherwise fall victim to violent attacks that could destabilize international relations. The Convention preamble emphasizes that terrorism "jeopardize[s] the friendly relations among States and peoples" and identifies the financing of terrorism as a "matter of grave concern to the international community as a

whole" because "the number and seriousness of acts of international terrorism depend on the financing that terrorists may obtain." Any norm arising from the Convention and its precise implementation seeks to eradicate the harms of acts of terrorism, by cutting off the funding needed to perpetrate violence. Accordingly, it is the harms caused by terrorism that fall within the scope of any conceivable liability for violations of this norm. *Cf.* 18 U.S.C. § 2333(a), (d) (creating a cause of action for terrorist financing when a U.S. national suffers "an injury arising from an act of international terrorism").

The inescapable problem with Plaintiffs' case is that their cause of action is not related to the risks and harms of terrorist acts that are addressed by any international prohibition against financing terrorism. Plaintiffs proceed on the theory that "Defendants had actual knowledge that providing banking services to or on behalf of Hezbollah was not permitted under U.S. law and would subject LCB's assets to forfeiture by the U.S. government." J. App'x 706 ¶154. The SAC alleges that LCB, and Plaintiffs consequently, "suffered a substantial loss as a direct result of Defendants' acts to finance Hezbollah's terror attacks on civilians [when] . . . LCB was required to forfeit $102 million of Bank funds in settlement

18

of the claims asserted in the Civil Forfeiture Complaint[.]"[4] *Id.* at 660 ¶10. Those forfeited funds were "the proceeds from a sale of LCB assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme." *Id.* at 661 ¶10.

The economic harm suffered by shareholders of banks used to finance terrorism, while real, is not the harm that animated the development of any international prohibition of terrorist financing. Plaintiffs make no claim that they were injured by an act of terrorism that was committed by Hezbollah and facilitated by Defendants. Rather, they allege only harm arising from the mismanagement of LCB that left its assets vulnerable to forfeiture. To be sure, Plaintiffs correctly point out that the ultimate basis of the civil forfeiture action and costly settlement of that action was Defendants' money laundering in support of terrorism. But the same harm would have resulted had Defendants used the Bank to engage in any number of other unlawful activities – say, widespread fraud or the rigging of interest rate standards – that could result in financial penalties, or any other misapplication of corporate funds that resulted

---

[4] Plaintiffs also allege that they have been harmed by the inability of Abu Nahl, his family, and employees of Nest Investments to get visas to travel to the United States as a result of their association with LCB.

in a similar decline in the economic value of the corporation. The economic loss to Plaintiffs would have been the same had Defendants used corporate funds to buy villas for themselves, to make utterly reckless investments in companies owned by their relatives, or, for that matter, to make personal contributions to their favorite charities without a corporate purpose. Indeed, Plaintiffs allege that the money-laundering scheme that eventually caught the eye of the United States was designed in substantial part to facilitate Abou Jaoude and Hamdoun's "looting [of] LCB assets" for their personal gain – a purpose extraneous to its support of Hezbollah. J. App'x 698 ¶123; *see id.* at 698-700. Nothing about the harm suffered by Plaintiffs is specific to the relevant norm of international law; it is entirely disconnected from the mutual concern that undergirds any prohibition on the financing of terrorism. *See* RESTATEMENT (THIRD) OF TORTS § 29 cmt. d (directing consideration of "the risks that made the actor's conduct tortious, and . . . whether the harm for which recovery is sought was a result of any of those risks").

Though the SAC attempts to elide the distinction, its allegations describe two separate tortious acts. Defendants violated the law of nations by funding terrorism; Defendants *also* breached their fiduciary duty to Plaintiffs – and

perhaps committed other torts – by using the Bank for purposes that were in the private interests of Defendants and were in derogation of the interests of the shareholders. Those are distinct torts, risking distinct harms, with different victims: the violence and instability wrought by terrorist acts harming innocent civilians, versus the economic harms to shareholders resulting from unscrupulous and self-interested acts by corporate managers.

Our conclusion that Plaintiffs' cause of action is not viable under the ATS is supported by the fact that the acts by which Defendants wronged Plaintiffs are a matter of several, rather than mutual, concern. While a prohibition against terrorist financing would be a matter of mutual concern among nations, the harm that Plaintiffs actually suffered – essentially a breach of fiduciary duty in mismanaging corporate assets – is as yet a matter of several or local concern, as Plaintiffs themselves implicitly recognized by bringing a similar shareholder action under domestic Lebanese law. That claims stemming from corporate misfeasance cannot give rise to jurisdiction under the ATS is established by one of our earliest ATS cases, *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975), *abrogated on other grounds by Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010). In *IIT*, a Luxembourgish investment trust brought suit against a Bahamian

21

corporation, alleging fraud, conversion, and corporate waste. We held that plaintiffs had not alleged a violation of the law of nations, reasoning that while virtually all nations prohibit theft in their domestic laws, "the Eighth Commandment 'Thou shalt not steal' is [not] part of the law of nations" because it does not address an issue of mutual concern among states. *Id.* at 1015. In a similar case, the Ninth Circuit agreed that "looting of a bank by its insiders[] and misrepresentations about the bank's financial condition" are "garden variety" violations of domestic law that do not give rise to an ATS claim because they "are not of a kind affecting the relationship between states or between an individual and a foreign state." *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1418 (9th Cir. 1995) (rejecting claim for fraud, breach of fiduciary duty, and misappropriation of funds).

Moreover, recognizing a cause of action under these circumstances would raise exactly the kinds of concerns that troubled the Supreme Court in *Sosa* and *Jesner*. Even assuming that the importance of enforcing a norm against financing terrorism might in some cases outweigh the adverse consequences of making "th[e] cause available to litigants in the federal courts" or the possible foreign policy complications of recognizing such claims, *Sosa*, 542 U.S. at 733, the balance

22

of prudential concerns clearly weighs against permitting foreign plaintiffs to sue foreign defendants for breaches of fiduciary duty in the management of foreign corporations, duplicating similar commercial litigation in the domestic courts of the country where the corporation operates.

In short, Plaintiffs' SAC does not escape the same concerns that caused the district court to dismiss their FAC. Any prohibition of financing terrorism addresses the wrongs committed by secondary parties who support the primary actors carrying out acts of terrorism or other abuses of human rights that present issues of mutual concern to all nations and cause harm to the victims of the primary terrorist acts. In its dismissal of the FAC, the district court correctly concluded that Plaintiffs, not having been harmed by the primary violations allegedly committed by Hezbollah and funded by Defendants, could not sue Defendants on the theory that Defendants aided and abetted those violations. Plaintiffs may not escape that holding by relabeling Defendants' alleged complicity in those primary violations as a separate violation of international law, when the harm done to them stemmed not from the terrorist acts but from the mismanagement of a corporation. The creation of an international convention requiring nations to make specific forms of complicity in terrorist activity a

separate violation of law does not change the fact that financing terrorism, whether or not defined as a separate form of wrongdoing, is prohibited to protect the victims of the primary terrorist acts. The prohibition is not intended to protect the shareholders of a bank that suffered losses not as a result of terrorism, but because the involvement of its officers in supporting terrorism was detected and punished.

We thus conclude that Plaintiffs' effort to amend their complaint is futile, because – even if "financing terrorism" violates a universal, specific, and obligatory norm of international law – their cause of action is based on harm that falls outside the scope of any such norm. Plaintiffs' economic harm is disconnected from the risks that would bring the financing of terrorism within the purview of international law. The ATS does not confer federal jurisdiction over the alleged violations of corporate law principles that ground Plaintiffs' claim.

## CONCLUSION

For the reasons set forth above, we find that Plaintiffs' effort to amend their complaint is futile. The order of the district court is therefore **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

24

1

JOHN M. WALKER, JR., *Circuit Judge*, concurring:

Judge Lynch's opinion explores one appropriate basis on which to resolve this case, and I concur in its reasoning and in its result. I write separately because, apart from Judge Lynch's reasoning, the complaint can be dismissed upon a more traditional basis for resolving Alien Tort Statute (ATS) claims: the absence of a violation of the law of nations.

In their briefing, the parties dispute whether a prohibition on terrorist financing has passed into international law. This question, in my view, is not open for debate. Nor is it the appropriate question to ask in this case.

In a recent judgment, the International Court of Justice (ICJ) pronounced that "financing by a State of acts of terrorism" is prohibited under international law.[1] The ICJ's conclusion accords with U.N. Security Council Resolution 1373, which created a binding obligation on all U.N. Member States to "[r]efrain from providing any form of support, active or passive, to entities or persons involved in terrorist acts."[2] However, that *States* have an obligation to refrain from financing terrorist acts has little bearing on whether Defendants violated international law. These Defendants are not States.

Therefore, the appropriate question to ask in this case is whether international law directly prohibits *individuals* from financing terrorist acts. It is

---

[1] *Application of the International Convention for the Suppression of the Financing of Terrorism and of the International Convention on the Elimination of All Forms of Racial Discrimination (Ukr. v. Russ. Fed.)*, Judgment, 2019 I.C.J. Rep. __, ¶¶ 59–60 (Nov. 8, 2019).

[2] S.C. Res. 1373, ¶ 2(a), U.N. Doc. S/RES/1373 (Sept. 28, 2011) ("*Decides also* that all States shall . . . Refrain from providing any form of support, active or passive, to entities or persons involved in terrorist acts" (emphasis in original)); *see also* Michael C. Wood, *The Interpretation of Security Council Resolutions*, 2 MAX PLANCK Y.B. UNITED NATIONS L. 74, 82 (1998) (explaining that "Decides" is a term of art in U.N. Security Council resolutions that signals the obligatory force of the resolution).

not enough for Plaintiffs to show that customary international law prohibiting terrorist financing has crystallized. Most obligations of international law are binding only on States, and "the existence of a customary rule outlawing [an act] does not automatically mean that [the act] is a criminal offence under international law,"[3] or an international law prohibition on individual conduct.[4]

In this case, Plaintiffs have not shown that international law directly prohibits individuals from financing terrorist acts. Although Article 4 of the widely-ratified Terrorist Financing Convention[5] and U.N. Security Council Resolution 1373[6] obligate States to criminalize terrorist financing under their domestic laws, this obligation does not translate into the criminalization of terrorist financing under international law. To illustrate, the widely-adopted International Convention on the Regulation of Whaling provides that "infractions against or contraventions of" that convention "shall" be punishable and prosecuted under States' domestic laws.[7] Yet no one would contend that illicit whaling is an international crime or could sustain an ATS claim. Other treaties that mandate the domestic criminalization of certain conduct, including treaties

---

[3] *Prosecutor v. Ayyash et al.*, No. STL-11-01/I, Interlocutory Decision on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging, ¶ 103 (Special Tribunal for Lebanon Feb. 16, 2011).

[4] International criminal law (a small subset of customary international law) regulates individual, rather than State, conduct. As we have recognized previously, the Alien Tort Statute establishes a civil remedy for victims of international crimes. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010) ("[B]ecause customary international law imposes individual liability for a limited number of international crimes . . . we have held that the ATS provides jurisdiction over claims in tort against individuals who are alleged to have committed such crimes.")

[5] Terrorist Financing Convention art. 4.

[6] S.C. Res. 1373, ¶ 2.

[7] International Convention for the Regulation of Whaling art. IX, Dec. 2, 1946, 63 Stat. 1716, 161 U.N.T.S. 72.

with language that is nearly identical to that in the Terrorist Financing Convention,[8] have not been represented as the actual or aspirational international criminalization of such conduct. It is more than noteworthy that the Council of Europe (comprising 47 States) reported in 2017 that "none of its conventions foresees the establishment of 'universal' criminal jurisdiction" despite the fact that "such conventions contain provisions calling upon States to ensure that their internal law establishes jurisdiction of their criminal courts to judge relevant offences."[9]

Because the near-universal domestic criminalization of certain conduct is insufficient to establish that conduct as an international crime, what *does* render individual conduct the subject of international law warrants discussion. As I see it, the essential quality of an international crime is universal jurisdiction over the commission of that crime.[10] Indeed, we have already indicated as much in *In re Terrorist Attacks on September 11, 2001*.[11] When a crime offends an international rule that binds individuals across all States, rather than the domestic law of any

---

[8] *Compare* Convention on Cybercrime art. 2, Nov. 23, 2001, Eur. T.S. No. 185, *with* Terrorist Financing Convention art. 4.

[9] *The Scope and Application of the Principle of Universal Jurisdiction*, Report of the Secretary General, ¶ 33, U.N. Doc. A/72/112 (June 22, 2017).

[10] *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 762 (2004) (Breyer, J., concurring) ("Today international law will sometimes . . . reflect not only *substantive* agreement as to certain universally condemned behavior but also *procedural* agreement that universal jurisdiction exists to prosecute a subset of that behavior. . . . That subset includes torture, genocide, crimes against humanity, and war crimes." (emphasis added)).

[11] 714 F.3d 118, 125 (2d Cir. 2013) (rejecting an ATS cause of action for terrorism because "'terrorism—unlike piracy, war crimes, and crimes against humanity—does not provide a basis for universal jurisdiction'" (quoting *United States v. Yousef*, 327 F.3d 56, 106–08 (2d Cir. 2003)); *see also Kiobel*, 621 F.3d at 140 (rejecting the logical extrapolation of new ATS causes of action from existing causes of action because "[t]he strictly limited set of crimes subject to universal jurisdiction cannot be expanded by drawing an analogy between some new crime . . . and universal jurisdiction's traditional subjects" (quoting *Yousef*, 327 F.3d at 103–04)).

one State, the crime is "thus triable by the courts of all States."[12]  Section 413 of the Restatement (Fourth) of Foreign Relations, discussing universal jurisdiction, explains that

> International law recognizes a state's jurisdiction to prescribe law with respect to certain offenses of universal concern, such as genocide, crimes against humanity, war crimes, certain acts of terrorism, piracy, the slave trade, and torture, even if no specific connection exists between the state and the persons or conduct being regulated.[13]

Universal jurisdiction is what distinguishes, say, murder, which is domestically criminalized in all States,[14] from crimes against humanity, which are domestically criminalized in just a handful of States.[15]  Despite the universal criminalization of murder, no State holds the legal belief that it or any other State can prosecute a murder that lacks any connection to the State's territory, nationals, or interests. Indeed, no State has exercised its jurisdiction to legislate on, enforce against, or adjudicate murders that occur in other States and are perpetrated by foreign nationals against other foreign nationals.  It follows that, as a matter of customary

---

[12] ROSALYN HIGGINS, PROBLEMS & PROCESS: INTERNATIONAL LAW AND HOW WE USE IT 59 (1994) (quoting a 1956 British military law manual that described "war crimes" as "crimes *ex jure gentium*" and declared that universal jurisdiction followed from that fact).

[13] Restatement (Fourth) of Foreign Relations § 413 (Am. Law Inst. 2019).

[14] A State's domestic laws on murder are arguably a matter of international concern under various human rights instruments.  *See* Human Rights Comm., *General Comment No. 36 (2018) on Article 6 of the International Covenant on Civil and Political Rights, on the Right to Life*, ¶ 20, U.N. Doc. CCPR/C/GC/36 (Oct. 30, 2018).  Accordingly, I would not distinguish between murder and crimes against humanity on the basis that international law, as a descriptive matter, has nothing to say on the former but much to say on the latter.

[15] *See* Mia Swart, *The Legal Foundation for Criminalizing International Crimes: A Response to Kevin Jon Heller*, HARVARD INT'L L.J. ONLINE 1, 2 (2018) (explaining that "the small [number] of countries that have criminalized core international crimes [crimes against humanity, war crimes, and genocide] points to the fact that the status of 'international crime' cannot depend on the extent to which . . . states have criminalized" certain conduct).

international law, murder cannot be subject to universal jurisdiction and therefore cannot be an international crime.[16] The opposite circumstance prevails for crimes against humanity, the universal jurisdiction for which is confirmed by widespread State practice and States' beliefs about their legal obligations (referred to in international law as "*opinio juris*"), including statutes pertaining to international criminal tribunals and States' exercises of their jurisdiction.

Plaintiffs have failed to marshal any State practice or evidence of *opinio juris* suggesting that terrorist financing is an international crime or otherwise subject to universal jurisdiction. And the State practice and evidence of *opinio juris* that Plaintiffs could have marshaled is weak. Only one tribunal of an international character, the Special Tribunal for Lebanon, has identified that customary international law "addresses itself to individuals by imposing on them the strict obligation to refrain from engaging in terrorism."[17] That same Tribunal, without any supporting analysis and outside the context of judicial proceedings, described "the financing of terrorism" as "a crime per se under international law."[18] These broad pronouncements on terrorism and terrorist financing are undercut by the fact that the Tribunal never exercised, and in fact could not exercise, universal jurisdiction and was bound to apply Lebanese domestic law under its founding statute.[19]

---

[16] *See North Sea Continental Shelf Cases (Fed. Rep. Ger. v. Den. & Neth.)*, 1969 I.C.J. 4, ¶ 77 (Feb. 20, 1969) (explaining that customary international law is the composite of State acts that "amount to a settled practice" and "a belief that this practice is rendered obligatory [or permissible] by the existence of a rule of law requiring [or allowing] it").

[17] *See Ayyash et al.*, ¶ 105.

[18] SPECIAL TRIBUNAL FOR LEBANON, ANNUAL REPORT 28 (2010).

[19] *Statute of the Special Tribunal for Lebanon*, S.C. Res. 1757, Annex arts. 1–2, U.N. Doc. S/RES/1757 (May 30, 2007).

The strongest evidence that terrorist financing is an international crime subject to universal jurisdiction comes from the Terrorist Financing Convention itself, albeit in a provision not cited by Plaintiffs. Article 7 of that treaty describes the circumstances in which a State Party "shall" or "may" exercise jurisdiction over terrorist financing.[20] Paragraph 4, in particular, provides:

> Each State Party shall . . . establish its jurisdiction over [terrorist financing] in cases where the alleged offender is present in its territory and it does not extradite that person to any of the States Parties that have established their jurisdiction.[21]

Because the Terrorist Financing Convention is widely ratified, this comes close to an articulation of universal jurisdiction (despite the provision being operative only among State Parties). But it still falls short because it conditions State Parties' exercises of jurisdiction on at least one other State Party already having established jurisdiction.[22] Paragraph 4, then, is best understood as an effort to prevent a State Party from declining to extradite individuals subject to prosecution in another State Party, rather than an articulation of universal jurisdiction.[23] Moreover, it does not appear that State Parties have made efforts to update their criminal laws to comply with Paragraph 4, much less to exercise pure universal jurisdiction over terrorist financing.[24]

---

[20] Terrorist Financing Convention art. 7.

[21] *Id*. at art. 7(4).

[22] *Compare id*. *with* International Convention on the Suppression and Punishment of the Crime of Apartheid art. IV, Nov. 30, 1973, 1015 U.N.T.S. 243 (requiring States party to exercise pure universal jurisdiction over the crime of apartheid).

[23] *See* HIGGINS, PROBLEMS & PROCESS: INTERNATIONAL LAW AND HOW WE USE IT 64–65 (explaining that treaty extradite-or-prosecute provisions do not establish universal jurisdiction).

[24] Laura Halonen, *Catch Them If You Can: Compatibility of United Kingdom and United States Legislation Against Financing Terrorism with Public International Law Rules on Jurisdiction*, 26 EMORY INT'L L. REV. 637, 653 (2012) (reviewing State practice, as documented in country reports

In addition to the paucity of evidence supporting Plaintiffs' position, the failure of the international community to criminalize terrorist financing, despite numerous efforts to do so, counsels against identifying terrorist financing as an international crime.  A draft of the Rome Statute included "crimes of terrorism," such as "sponsoring, ordering, facilitating, financing, encouraging or tolerating acts . . . of such a nature as to create terror."[25]  All crimes of terrorism, however, were removed from the draft because

> there was no general definition of [terrorism;] . . . these crimes were often similar to common crimes under national law in contrast to the crimes listed in other subparagraphs [like war crimes and crimes against humanity]; the inclusion of these crimes would . . . detract[] from the other core crimes; these crimes could be more effectively investigated and prosecuted by national authorities under existing international cooperation agreements for reasons similar to those relating to illicit drug trafficking; and the inclusion of the crimes could lessen the resolve of States to conduct national investigations and prosecutions and politicize the functions of the court.[26]

The closest the international community has come to criminalizing terrorist financing since the drafting of the Rome Statute is the African Union's 2014 Malabo Protocol, which sought to form an African criminal court.  The Malabo Protocol's statute for the African criminal court sought to criminalize terrorism and the

submitted to the United Nations and concluding that legislation providing for universal jurisdiction over terrorist financing is uncommon among States).

[25] *Report of the Preparatory Committee on the Establishment of an International Criminal Court*, Addendum, at 27, U.N. Doc. A/CONF.183/2/Add.1 (1998).

[26] *Summary of the Proceedings of the Preparatory Committee During the Period 25 March–12 April 1996*, ¶ 67, U.N. Doc. A/AC.249/1 (1996).

"sponsoring" of or "contribution to" terrorist acts.[27]  However, in the six years since the African Union adopted the Malabo Protocol, not a single State has ratified it, and international law is no closer to criminalizing terrorist financing.

Finally, UNODC, the United Nations office that oversees and assists the global response to terrorist financing, currently disavows that "the UN's 19 counter terrorism instruments," including the Terrorist Financing Convention, "extend to universal jurisdiction."[28]  While international law may criminalize the aiding and abetting of terrorist acts that rise to the level of genocide, crimes against humanity, or war crimes,[29] it imposes no criminal prohibition on terrorist financing that does not lead to such atrocity crimes.  UNODC's view that universal jurisdiction for terrorist financing has not yet crystallized as a part of customary international law is shared by a broad swath of other international law authorities and scholars.[30]

Our case law is resolute that, in the absence of congressional authorization, district courts face a "high bar" for identifying new ATS causes of action and must exercise "great caution in adapting the law of nations to private rights."[31]  A prohibition on terrorist financing by individuals is not the kind of "clear and well-established international-law rule" for which it may be appropriate to add to our

---

[27] Draft Protocol on Amendments to the Protocol on the Statute of the African Court of Justice and Human Rights art. 28G(B), A.U. Doc. No. STC/Legal/Min. 7(1) Rev. 1 (2014).

[28] U.N. Office on Drugs and Crime, *Counter-Terrorism: Criminal Justice Responses to Terrorism*, UNODC.ORG (July 2018), https://www.unodc.org/e4j/en/terrorism/module-4/key-issues/criminal-justice-responses.html.

[29] *Id*.

[30] *See, e.g.*, LORI F. DAMROSCH & SEAN D. MURPHY, INTERNATIONAL LAW: CASES AND MATERIALS 779 (7th ed. 2019) (querying whether terrorist financing *should* be an international crime).

[31] *Sosa*, 542 U.S. at 727–28.

ATS jurisprudence.[32]  For this reason, I would hold that the district court erred in finding that Plaintiffs had plausibly alleged a violation of the law of nations based on Defendants' individual conduct.

Separately, I disagree with the district court's alternative holding that Plaintiffs plausibly alleged a violation of the law of nations based on Defendants' conduct in concert with the State of Lebanon.  Plaintiffs have not adequately pled the Central Bank of Lebanon's knowledge of Defendants' terrorist financing. Although Plaintiffs alleged that the Central Bank knew or should have known of Defendants' money-laundering scheme, nowhere did they plead that the Central Bank was aware that Defendants' money-laundering scheme was a terrorist-financing scheme.  To the contrary, Plaintiffs characterized Defendants' scheme as "shrouded in secret" and designed "to allow money to be laundered efficiently and without detection."[33]  Customary international law imposes due-diligence obligations on States in but a handful of contexts.  This is not one of them.[34]  Plaintiffs' failure to allege Lebanon's knowledge of Defendants' terrorist financing forecloses their State action argument.

Finding none of Plaintiffs' arguments availing, I join the majority in reversing the district court.

---

[32] *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018).

[33] App'x at 674, 680.

[34] *Application of the International Convention for the Suppression of the Financing of Terrorism and of the International Convention on the Elimination of All Forms of Racial Discrimination (Ukr. v. Russ. Fed.)*, Judgment, 2019 I.C.J. Rep. at ¶¶ 42, 49  (using the *mens rea* requirement from Terrorist Financing Convention art. 2(1) to assess whether "Russian officials . . . 'knowingly provided' to a terrorist organization" "the missile launching system that was used to shoot down flight MH17").